THE MOUNTAIN WATER CO. OF LA CRESCENTA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71607. Filed December 13, 1960.

*Robert L. Farmer, Esq.*, for the petitioner.
*Charles F. Quinlan, Esq.*, for the respondent.

## OPINION.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the calendar year 1955 in the amount of $45,457.36. The issues for decision are: (1) Whether gain from the involuntary sale of all of petitioner's assets is includible in "income" for the purpose of applying the limitation in section 501(c)(12), I.R.C. 1954, under which petitioner was otherwise qualified for exemption from taxation; and (2) if petitioner was not exempt from taxation, whether petitioner (a) adopted a plan of complete liquidation on or before the date of the sale of its operating assets, and (b) distributed all of its assets within 12 months of that date, so as to be nontaxable on the gain realized on the sale of its operating assets under section 337, I.R.C. 1954.[1]

All the facts are stipulated and are so found.

Petitioner was a corporation organized and doing business under the laws of the State of California from its incorporation on March 5, 1924, until the year 1955, when it sold its operating assets and

---

[1] All references are to the 1954 Code unless otherwise noted.

undertook steps toward complete liquidation. With its principal office in the city of La Crescenta, California, petitioner filed its final tax return on an accrual basis for the period January 1, 1955, to July 31, 1955, with the district director of internal revenue, Los Angeles, California.

Petitioner was incorporated for the purpose of conducting a mutual water company business. As required by its articles of incorporation and bylaws, petitioner was operated from the date of its formation solely to supply water for domestic and commercial use to its shareholders and to no others. In each year of its existence prior to the year 1955, petitioner met the requirements for and was exempt from Federal income taxation as a mutual water company under section 501(c)(12), and its predecessor sections under the 1939 Code, and respondent had so ruled.

In or about 1950, the Crescenta Valley County Water District (herein, county water district) was formed as a political subdivision of the State of California for the purpose of acquiring and consolidating certain existing mutual water companies, including petitioner. Funds for the acquisition of such mutual water companies were secured from bonds issued by the county water district pursuant to the authority under which it was created. An offer by the county water district to purchase the assets of petitioner was rejected by petitioner, and the county water district thereupon commenced condemnation proceedings against the operating assets of petitioner pursuant to the power of eminent domain held by the county water district. Petitioner determined by a formal canvass of opinion that its members did not wish its assets to be acquired by the county water district. Petitioner thereupon defended the condemnation action in an effort to increase the condemnation award to an amount greater than the authorized bond capacity of the county water district. The trial court before which the condemnation case was tried reached a decision on January 13, 1955, that petitioner should be awarded $600,884 for its assets, subject to an adjustment for proration of property taxes.

A meeting of the board of directors of petitioner was held January 14, 1955, and it was determined among other things that the shareholders of petitioner should be advised of the results of the condemnation proceedings, and that a joint meeting should be held as soon as possible with the directors of the county water district to discuss the many details in dissolving the company in an orderly fashion. Thereafter, during the month of January 1955, a communication was mailed to the shareholders of petitioner, advising them of the judgment of the trial court and stating that the county water district would shortly take possession of the assets. The shareholders were

also informed that petitioner would be dissolved and the value of each share would be computed as quickly as possible.

At a special meeting held on January 24, 1955, to consider matters related to petitioner's future, the board of directors of petitioner discussed and postponed a decision on whether its counsel should waive the findings of fact and conclusions of law in the condemnation proceedings. At a regular meeting on January 31, 1955, it was determined upon the advice of counsel not to file such a waiver so that petitioner's right to appeal the trial court's decision would be preserved.

Notice of the regular annual meeting of the shareholders of petitioner to be held March 7, 1955, was mailed to its shareholders prior to the date of the meeting. The notice, among other things, advised the shareholders of the amount of the award of the trial court in the condemnation proceedings and advised the shareholders that this award should result in each shareholder's receiving $165 per share. The notice further advised the shareholders that a number of legal steps must be followed before final dispersal of each shareholder's distributive share could be made. The first step was stated to be the assumption by the county water district of the responsibility for the operation of petitioner's water system and "From that point on your Company will proceed to dissolve itself and disperse all monies * * * as quickly as the law allows."

A quorum of the shareholders failed to appear in person or by proxy at the annual meeting of the shareholders on March 7, 1955, and, as a result, no formal action was taken at the meeting. Minutes of the meeting were not transcribed by the stenographer present, under instructions that in the absence of a quorum no meeting was held.

A meeting of the board of directors of petitioner was held April 25, 1955. At this meeting the findings of fact and conclusions of law found by the trial court were reviewed by counsel for the corporation and grounds for an appeal of the trial court's decision were discussed. It was finally determined that no appeal from the condemnation judgment should be taken. Immediately thereupon, a representative of the county water district presented its check to the board of directors of petitioner in the amount of $598,905.62, which amount constituted the trial court's judgment ($600,884, less taxes) and was $181,829.45 greater than the adjusted cost basis of the assets transferred. A satisfaction of judgment was signed by the officers of petitioner and delivered to the representative of the county water district. The board of directors of petitioner then turned to the matter of winding up the affairs of petitioner. In a series of motions the board agreed to accept the county water district's offer of office space and part-time personnel for the "winding-up" period, to request refunds on various sums that were on deposit with several gov-

ernmental authorities, to retain certain employees and services required to wind up, and to notify lending institutions that shares of stock would not be transferred after May 5, 1955. The board also agreed to secure the shareholders' consent to dissolution by "consent cards" mailed with an explanatory transmittal letter as soon as practical to all shareholders of record. The letter and consent cards were sent to stockholders under date of April 29, 1955, explaining that voluntary dissolution by shareholders (under section 4600 of the California Corporations Code) required the vote or consent of 50 per cent of the voting shareholders.

On April 25, 1955, petitioner sold all of its operating assets to the county water district; the latter took possession on April 26, 1955.

The board of directors of petitioner again met on June 7, 1955, "for the purpose of canvassing the Consent Cards and considering Plans and Methods for Liquidation of the Company." A tabulation of the returned consent cards was made and disclosed that 2,420 of the outstanding 3,622 shares of petitioner had consented to its dissolution. The consent requisite under California law having been so secured, the board of directors of petitioner by resolution directed the appropriate officers of petitioner to execute and file a certificate of election to wind up and dissolve. Such a certificate was filed with the California secretary of state on June 14, 1955.

Subsequently, by letter of June 20, 1955, all stockholders were advised that:

The Board of Directors of the Mountain Water Company, having been directed by a majority of the shareholders to liquidate your Company, have determined to do so at the earliest possible moment, by resolution dated June 7, 1955, which appears on the reverse side of this letter.

The shareholders were further instructed in the steps to be taken to secure their liquidation distributions, amounting to somewhat more than $165 per share. By the resolution on the reverse side all shareholders and claimants were formally—

NOTIFIED that the proceedings for the winding up of said corporation commenced on June 7, 1955, upon the filing with said corporation on and before said date of the written consents of the shareholders of said corporation representing 50% or more of the voting power thereof stating such election to wind up and dissolve.

On June 30, 1955, petitioner filed Return of Information under section 148(d) of the Internal Revenue Code of 1939, Form 966, with the district director of internal revenue, Los Angeles, California, listing "June 7, 1955" as its "date of adoption of resolution or plan of dissolution, or complete or partial liquidation." Its Corporation Income Tax Return, Form 1120, for the period January 1, 1955, to July 31, 1955, was filed on September 2, 1955, with a request for prompt assessment under section 6501(d).

During the year 1955, petitioner's only receipts, excluding the condemnation proceeds, were $38,461.89 from the sale of water to its shareholders and $2,057.51 from discounts earned and interest received from the deposit of the condemnation award. Petitioner suffered a loss from operations for the year 1955, excluding the excess of condemnation proceeds over the cost basis of assets condemned.

Petitioner had 3,622 shares of its capital stock outstanding in June 1955. Distribution checks covering 3,618 of the shares were prepared and held for mailing as stockholders turned in their certificates for cancellation. The 4 shares for which checks were not prepared involved, respectively, a stockholder who had disclaimed his interest, two who were in default in their water bills, and a decedent, the distributee of whose estate was being sought. By appropriate action by the board of directors of petitioner all but the last mentioned of these latter 4 shares had been canceled by February 27, 1956.

As of December 31, 1955, petitioner had cash in banks and on hand of $75,776.26. Its accounts receivable totaled $2,001.54. Of this amount, $1,969.89 represented a property tax refund, which was collected in January 1956. Petitioner also carried as an asset $441.24 of prepaid insurance, covering comprehensive liability and fidelity insurance which was maintained by petitioner during the period of its liquidation. Petitioner had a liability of $243.29 for payroll taxes which had been withheld or incurred during the last quarter of 1955 with respect to employees employed by it to assist in its liquidation. The balance of petitioner's funds was held to complete distribution to shareholders entitled thereto and as a reserve for possible Federal income and California franchise taxes that might be due and for closing expenses. Upon the advice of counsel, the board of directors of petitioner had determined prior to December 31, 1955, that the balance amount was a proper and adequate reserve to meet claims against petitioner.

As of April 15, 1956, there were 5 shares of stock outstanding. One was being held by petitioner at the request of an attorney still seeking the distributee of the deceased shareholder's estate. Of the other 4 shares, 2 shares were held by a couple involved in divorce proceedings and 2 shares were held by another deceased shareholder. Certificates representing these latter 4 shares were received by petitioner for cancellation between April 16 and April 30, 1956— petitioner's records do not reveal the actual date of receipt. Distribution checks in respect to these 4 shares were signed April 30, 1956, and were mailed immediately thereafter. Petitioner's officers had adopted a practice of meeting only twice each month to handle distribution matters.

Only the share held for the missing distributee remained outstanding after April 30, 1956. As of April 24, 1956, and April 5, 1957,

checks which had been delivered in respect to 8 shares involving 3 shareholders and $1,320 had not been negotiated or deposited for collection.

## Issue 1.

The first issue is whether petitioner was exempt from tax under section 501(c)(12). Petitioner admittedly qualified for exemption under this section as a mutual water company for years prior to 1955, and respondent concedes that if the capital gain realized by petitioner on the involuntary sale of its operating assets in 1955 is not includible in income for purposes of computing the 85 per cent limitation in section 501(c)(12), petitioner is also tax exempt for 1955.

The applicable portions of section 501 provide that an organization described in subsection (c) shall be exempt from taxation, and paragraph (12) of subsection (c) reads as follows:

Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses.

Petitioner, recognizing that "gross income" has long been defined in the revenue laws as including "gains * * * derived from * * * dealings in property,"[2] contends that Congress intended "income" as used in section 501(c)(12) to include only a limited class of income; specifically, "interest, dividends, rents," and "amounts collected from members for the purpose of meeting losses and expenses."

Petitioner cites no authority for this position but relies on the legislative history of sections 501(c)(12) and 501(c)(15), the latter relating to mutual insurance companies other than life and marine, to conclude that the "income referred to in section 501(c)(12) and its predecessor sections[3] was intended to include only the items listed in section 501(c)(15) and its predecessor section 101(11) of the 1939 Code, as amended by the Revenue Act of 1942. Section 501(c)(15), prior to its amendment in 1956, exempted from tax:

Mutual insurance companies or associations other than life or marine * * * if the gross amount received during the taxable year from interest, dividends, rents, and premiums (including deposits and assessments) does not exceed $75,000.

We have examined the legislative history of these two sections, and the congressional committee reports referred to by petitioner in its brief and have concluded that they do not support petitioner's conten-

---

[2] See sec. 61(a), I.R.C. 1954, and sec. 22(a), I.R.C. 1939, and predecessor sections.
[3] Sec. 101(10), I.R.C. 1939; sec. 231(10), Revenue Acts of 1926 and 1924; sec. 11(a), Revenue Act of 1916.

tion. This seems particularly apparent from the fact, without going into details of the legislative history, that in the Revenue Act of 1926 Congress separated the requirements for exemption of mutual casualty or fire insurance companies (sec. 231(11)) and the requirements for exemption of benevolent life insurance associations of a purely local character and mutual water companies and like organizations (sec. 231(10)), and since that time has consistently provided different income standards for qualification under the two provisions, and the further fact that in 1942 Congress specifically amended the income standards provided for mutual casualty companies to include only amounts received from investment income and premiums, while making no amendment to the income standards provided for mutual water companies and like organizations.

It may well be that, if faced with the specific problem, Congress would not deny exemption to a mutual water company which otherwise meets the requirements of section 501(c)(12) in the last year of its operation simply because it realized a capital gain on the involuntary sale of all its operating assets in excess of 15 per cent of its income, but that is a matter for Congress,[4] and we find no authority or reason in either the legislative history or elsewhere to construe this statute in a manner other than what appears to us to be required by the clear meaning of the words used therein. *Edith M. O'Donnell*, 35 B.T.A. 251, affd. 94 F. 2d 852 (C.A. 2, 1938); *Crooks* v. *Harrelson*, 282 U.S. 55.

We conclude that petitioner was not tax exempt in 1955. Cf. *Allgemeiner Arbeiter Verein*, 25 T.C. 371, affirmed per curiam 237 F. 2d 604 (C.A. 3, 1956).

### Issue 2.

The second issue is whether section 337 precludes recognition of the gain on the sale of all of petitioner's operating assets in 1955. The pertinent part of section 337 is as follows:

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

Respondent contends that section 337 is not applicable because (a) the sale of petitioner's assets occurred prior to the adoption of a plan of liquidation, which respondent claims occurred on June 7, 1955,

---

[4] It may well be that Congress believes it has already provided any relief warranted in such a situation by provisions such as section 337.

and (b) because even if the plan of liquidation was adopted on April 25, 1955, as claimed by petitioner, petitioner failed to distribute all of its assets in complete liquidation within the 12-month period beginning with the date of adoption of the plan of liquidation.

(a) The section 337 provisions first appeared in the 1954 Code and were enacted to eliminate the questions which arose under *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, as to whether a corporation in the process of complete liquidation made a sale of assets or whether the shareholder receiving the assets made the sale, and to provide a definitive rule which would eliminate the existing uncertainties. S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 48, 258. The congressional committee reports, in discussing the new section, do not elaborate on or discuss the meaning of the statutory language "date of adoption of such plan" (plan of complete liquidation). However, the terminology "plan of liquidation" is not unique to section 337; it is also found in the 1954 Code sections 333 ("30-day" liquidations) and 332 (liquidation of a subsidiary), and in their predecessor sections 112(b)(7) and 112(b)(6) of the 1939 Code, respectively. Also section 115(c) of the 1939 Code, prior to its amendment in 1942, required a "plan of liquidation" for it to be applicable. The terminology "plan of liquidation" has been explored rather extensively under these earlier sections.

It is clear from the cases that the existence of a plan of liquidation, within the meaning of sections 115(c), 112(b)(6), and 112(b)(7) of the 1939 Code, does not require the formal adoption of a resolution by the directors or stockholders, and is dependent on the facts in each case. In *W. F. Kennemer*, 35 B.T.A. 415, affd. 96 F. 2d 177 (C.A. 5, 1938), this Court said, at page 421, in construing section 115(c) of the 1939 Code:

"Liquidation is a question of fact." * * * The adoption or failure to adopt a resolution of dissolution or liquidation is not controlling or determinative, * * *

In affirming, the Court of Appeals said:

The determining element was the intention to liquidate the business, coupled with the actual distribution of the cash to the stockholders. * * *

See also *John R. Roach*, 4 T.C. 1255.

The general propositions concerning liquidation were again applied and further amplified in *Burnside Veneer Co.*, 8 T.C. 442, affd. 167 F. 2d 214 (C.A. 6, 1948), which involved section 112(b)(6) of the 1939 Code. There the petitioner corporation had a subsidiary whose principal assets were destroyed by fire. The board of directors by resolution agreed that the corporation should be dissolved immediately and that the officers should take all proper steps, including the procurement of unanimous consent of the stockholders, to carry out

the dissolution. The operational activities of the company were discontinued. No stockholders meeting was held, but all stockholders consented in writing to the dissolution, which consents were filed with the secretary of state. The petitioner sought to avoid the nonrecognition provisions of section 112(b)(6) in order to take a loss, and argued that no plan of liquidation had been adopted. This Court felt that no greater formality could be judicially required to establish the existence of a "plan of liquidation" under section 112(b)(6) than would be required to establish the existence of a "bona fide plan of liquidation" under section 115(c), and in the absence of precedents on section 112(b)(6), adopted the general principles enunciated above in interpreting section 112(b)(6), and found that a "plan of liquidation" had been adopted. The Court of Appeals, in affirming this Court said (p. 217):

A plan is a method of putting into effect an intention or proposal. The statute does not require a formal plan. Here the proposal was the liquidation, and the method proposed of effecting the liquidation was the plan. * * *

It was against this background of judicial construction of the requirements in sections 115(c), 112(b)(6), and 112(b)(7) of the 1939 Code for existence of a plan of liquidation that Congress enacted section 337 of the 1954 Code, using essentially the same phraseology without specifying that formal adoption of a plan of liquidation by directors or stockholders was necessary. Under such circumstances and in the light of the purpose Congress sought to accomplish in this section, we see no reason to assume that any different requirements for adoption of a plan of liquidation were intended than those which the courts had required under the sections of the 1939 Code above mentioned.

The purpose of section 337 was to obviate the necessity of the legal gymnastics that had become necessary as a result of the *Court Holding Co.* decision to avoid a double tax on the gains from sale of all corporate assets in conjunction with an actual liquidation of the corporation. If all the facts and circumstances indicate that the assets were in fact sold as a part of a plan to liquidate the company and the corporation in fact goes out of business and distributes its assets in complete liquidation within the 12-month period, it would seem that that purpose has been accomplished. To read into the statute the requirement that formal legal steps be taken would tend to defeat the purpose of the statute rather than accomplish it.

We think it is clear from the evidence in this case that a plan of liquidation was adopted by petitioner on April 25, 1955, when the directors decided to accept the condemnation award without appeal and in fact accepted a check for the net amount thereof. Prior to that date the directors had recognized the probability that all the

operating assets of the company would be taken by the county water district and the purpose for existence of the company would cease; and it is apparent that the consensus of opinion was that if the condemnation was successful, the proceeds from the involuntary sale should be distributed in liquidation. But in view of the reluctance of the stockholders to sell without a fight, no final decision was made until the meeting of April 25, 1955. When the decision to accept the award was made at that meeting, the plan of liquidation was put into effect even though no formal resolution of liquidation or dissolution was adopted. Obtaining the consent of the stockholders to dissolve the company and the subsequent adoption of a resolution of dissolution at the directors meeting on June 7, 1955, was only one of the formal steps taken in carrying out the plan of liquidation. Liquidation can occur without dissolution—dissolution is a formal step taken to terminate the existence of a corporation which would normally follow liquidation, although not necessarily so.

Respondent relies primarily on section 1.337–2(b), Income Tax Regs., and the decision of this Court in *Virginia Ice & Freezing Corporation*, 30 T.C. 1251, in support of his position that the plan of liquidation was not adopted until June 7, 1955, and therefore the assets were sold prior to adoption of the plan of liquidation. In *Virginia Ice & Freezing Corporation, supra*, we held that on the facts there present two of the corporate properties were sold prior to the decision to sell all of the properties and liquidate. The facts here are different. There can be no question that the condemnation of all the operating assets of petitioner was the reason for the liquidation and that the decision to accept the award and sell all the properties was made at one time.

Section 1.337–2(b) of the regulations does state that ordinarily the date of adoption of a plan of complete liquidation is the date of adoption by the stockholders of a resolution authorizing the distribution of all the corporate assets in redemption of all of its stock, and that when substantially all the corporate assets are sold prior to the adoption of such a resolution by the stockholders, the sale will not be considered to have occurred within the 12-month period. Here no such resolution was ever adopted by the stockholders. At most all the stockholders did was consent to the dissolution of the corporation. The regulations also recognize that the ordinary procedure is not always followed, and provide that in such event the date of adoption of a plan of liquidation should be determined from all the facts and circumstances. We think the latter rule applies here and we conclude from the facts and circumstances here present that the plan of liquidation was adopted on April 25, 1955. See *Powell's Pontiac-Cadillac, Inc.* v. *Gross*, —— F. Supp. —— (D. N.J., Feb. 1960).

(b) Respondent also contends that because at least 1 and possibly

5 shares of stock had not been surrendered for cancellation by April 25, 1956, and because a few checks that had been mailed to stockholders prior to that date in payment for their stock had not been cashed by that date, the requirements of the statute were not met and the gain should be recognized to the corporation. Again in the light of the purpose of the statute, we do not think the application of such a strict construction of the statute is warranted on the facts here present. True, the statute uses the language "all of the assets of the corporation are distributed in complete liquidation," but it also provides for retention of sufficient assets "to meet claims." Respondent again relies on section 1.337–2(b) of the regulations, which includes the following:

A corporation will be considered to have distributed all of its property other than assets retained to meet claims even though it has retained an amount of cash equal to its known liabilities and liquidating expenses plus an amount of cash set aside under arrangements for the payment after the close of the 12-month period of unascertained or contingent liabilities and contingent expenses. Such arrangements for payment must be made in good faith, the amount set aside must be reasonable, and no amount may be set aside to meet claims of shareholders with respect to their stock. If it is established to the satisfaction of the Commissioner that there are shareholders who cannot be located, a distribution in liquidation includes a transfer to a State official, trustee, or other person authorized by law to receive distributions for the benefit of such shareholders. * * *

We recognize the justification for a rule which precludes the corporation from retaining substantial amounts to do with as its officers and directors please under the pretext of holding it to meet claims of stockholders with respect to their stock. Such could be utilized to circumvent the statute. But to apply this section of the regulations in the manner suggested by respondent here so as to require, for compliance with the statute, a distribution to some third party of every penny of cash admittedly due and in a fixed amount to redeem a few shares of stock the true ownership of which, or the identity and location of the owners thereof, cannot be determined within the 12-month period would not, in our opinion, be justified or warranted under the statute. One of the objectives of the statute was to avoid having the tax consequences of such transaction depend primarily on the formal manner in which transactions are arranged, thus causing a trap for the unwary. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A106.

The statute specifically authorizes retention of amounts "to meet claims." The regulations authorize the retention of amounts set aside in good faith to meet unascertained or contingent liabilities and expenses. If amounts set aside to meet claims prove to be in excess of the amounts required, the excess would have to be distributed pro rata to the stockholders. We see no need for any greater formality

with respect to amounts set aside in specified small amounts to redeem stock where it is clear from the facts that they would be used for that purpose alone and within a reasonable time.

We do not think the regulations either preclude or were intended to preclude application of section 337 to a situation such as here involved. There can be no question that it was in good faith intended to liquidate this corporation completely. A certificate of dissolution had been filed with the secretary of state. The only assets not distributed by the end of the 12-month period were apparently a rather sizable amount of cash held as a reserve for possible taxes [5] and an amount necessary to redeem a maximum of 5 shares of stock at the fixed rate of $165 per share, which represented approximately one-tenth of 1 per cent of the total shares outstanding on April 25, 1955. Under the law the directors were trustees of these assets for purposes of winding up the affairs of the corporation. We see no reason why the directors cannot be considered depositories of the small amounts necessary to redeem these few shares of stock as long as the amounts were held in good faith for that purpose only. The rules promulgated in the regulations were designed to prevent taxpayers from straddling the effect of section 337, or taking advantage of the statute without in fact intending to comply with its basic concept. A reasonable application of the regulations, depending on the facts and circumstances in each case, would accomplish this objective without defeating the purpose of the statute. We will so apply them here. See *Estate of Lewis B. Meyer*, 15 T.C. 850, reversed on other grounds 200 F. 2d 592 (C.A. 5, 1952), wherein this Court applied the *de minimis* rule under somewhat similar circumstances but under section 112(b)(7) of the 1939 Code (now section 333 of the 1954 Code).

We conclude that petitioner complied with all the requirements of section 337 and that no gain will be recognized to petitioner on the involuntary sale of its operating assets to the county water district.

*Decision will be entered for the petitioner.*

---

[5] The stipulation of facts does not state how much this was as of April 25, 1956.