RICHARD M. MILLS AND MOISE W. MILLS, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 85593–85595. Filed November 9, 1962.

*Charles M. Cork, Esq.,* for the petitioners.
*James E. Johnson, Jr., Esq.,* for the respondent.

FORRESTER, *Judge:* Respondent has determined the following deficiencies in income tax for the taxable year 1954:

| Docket No. | Deficiency |
| --- | --- |
| 85593 | $3,864.22 |
| 85594 | 3,537.88 |
| 85595 | 3,125.46 |

The issue before us is whether a certain transaction constituted a corporate reorganization as defined in section 368(a)(1) (B) or (C) of the Internal Revenue Code of 1954 [2] which would entitle petitioners to nonrecognition of the gain realized on the transaction.

#### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Richard M. Mills and Moise W. Mills, petitioners in Docket No. 85593, are husband and wife residing in Macon, Georgia. William R. Mills and Lorene M. Mills, petitioners in Docket No. 85594, are husband and wife residing in Wadley, Georgia. James S. Mills and Mary F. Mills, petitioners in Docket No. 85595, are husband and wife,

---

[1] Proceedings of the following petitioners are consolidated herewith: William R. Mills and Lorene M. Mills, Docket No. 85594; and James S. Mills and Mary F. Mills, Docket No. 85595.

[2] All statutory references are to the 1954 Code unless otherwise specified.

also residing in Wadley, Georgia. All three couples filed their joint Federal income tax returns for the year 1954 with the district director of internal revenue at Atlanta, Georgia.

Richard, William, and James Mills are brothers. Since the wife petitioners are involved solely because of the filing of joint returns, the husbands will hereinafter be referred to as petitioners.

On and prior to May 20, 1954, and until the exchanges hereinafter referred to, each petitioner was the owner of 30 shares of the common capital stock of Mills Gas and Appliance Company, Inc., a Georgia corporation, with its principal office and place of business in Louisville, Georgia; 6 shares of the common capital stock of Dixie Gas and Electric Company; and 6 shares of the common capital stock of Dixie Gas Distributors Corporation, the last two named corporations being South Carolina corporations with their principal offices and places of business in Ridgeland, South Carolina.

Early in 1954 petitioners and seven small gas companies in Georgia and South Carolina were negotiating a merger and pooling of assets to form one corporation to be known as Trans-Gas Corporation. Pursuant to these negotiations Arthur Andersen & Company was hired to prepare an audit.

Before the Trans-Gas negotiations had reached fruition, General Gas Corporation (hereinafter called General) contacted petitioner Richard M. Mills concerning a possible merger with General. General was a Delaware corporation with a listed stock and had supply facilities and a retail gas business in Louisiana and Mississippi.

Further negotiations between General and the 10 companies planning to merge into Trans-Gas occurred and culminated in the signing of an option agreement on May 20, 1954. This agreement provided in pertinent part:

For value received and the sum of One Dollar ($1.00), receipt of which is hereby acknowledged, the undersigned do severally grant to General Gas Corporation, a corporation organized and existing under the laws of the State of Delaware, an option for thirty (30) days from this date to acquire all of the capital stock of the corporation set opposite my name, whether the same be owned by the undersigned, or held or transferred to undersigned in _____ and now in his possession, the undersigned by this instrument hereby warranting his right to execute this agreement, as to the number of shares set down opposite the name of the corporation for the price and upon the terms and conditions hereinafter set out.

An audit of the books and affairs of each corporation as of the close of business on April 30, 1954, has been prepared or will be prepared by Arthur Andersen & Company, Certified Public Accountants, of Atlanta, Georgia, not later than thirty (30) days from this date applying its usual accounting methods and principles, all at the expense of each corporation for which said audit is made, and the parties hereby agree to accept the net book value of the capital stock of each corporation as thus determined by Arthur Andersen & Company as of April 30, 1954, as the price at which the stock will be sold.

In the event this option is exercised, the General Gas Corporation will issue and deliver to the undersigned, a sufficient number of shares of the common stock, of the par value of Five Dollars ($5.00) per share, of the General Gas Corporation, said stock to be taken at a value of Fourteen Dollars ($14.00) per share, as will equal the price of the stock owned or held by each of the undersigned, as determined above, provided that in the event the purchase price is not evenly divisible by shares at Fourteen Dollars ($14.00) per share, the difference will be paid in cash.

|  | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| *Stockholder* | | | *Corporation* | | | *Shares* |
| * | * | * | * | * | * | * |
| R. M. Mills | | | Mills Gas & Appliance Company, Inc. | | | 30 |
| /s/ R. M. Mills | | | Dixie Gas & Electric Company | | | 6 |
|  | | | Dixie Gas Distributors Corporation | | | 6 |
| W. R. Mills | | | Mills Gas & Appliance Company, Inc. | | | 30 |
| /s/ Wm. R. Mills | | | Dixie Gas & Electric Company | | | 6 |
|  | | | Dixie Gas Distributors Corporation | | | 6 |
| J. S. Mills | | | Mills Gas & Appliance Company, Inc. | | | 30 |
| /s/ J. S. Mills | | | Dixie Gas & Electric Company | | | 6 |
|  | | | Dixie Gas Distributors Corporation | | | 6 |
| * | * | * | * | * | * | * |

GENERAL GAS CORPORATION
By /s/ R. D. Phillips
*President*

Pursuant to the option agreement, Arthur Andersen & Company made an audit of the books of each of the above corporations. These audits were originally started in connection with the Trans-Gas venture but were completed under the option agreement. When the option agreement was signed the Trans-Gas negotiations ceased.

On July 8, 1954, General informed the stockholders of Mills Gas and Appliance Company, Inc., Dixie Gas Distributors Corporation, and Dixie Gas and Electric Company of its intention to exercise the option. On July 26, 1954, each of the petitioners was issued 1,321 shares of the common voting stock of the par value of $5 per share of General and was paid in cash $10.88 on account of the 30 shares of the capital stock owned by him of Mills Gas and Appliance Company, Inc.; 251 shares of said common voting stock of General and $8.36 in cash on account of the 6 shares of the capital stock owned by him of Dixie Gas Distributors Corporation; and 23 shares of said common voting stock of General and $8.12 in cash on account of the 6 shares owned by him of the capital stock of Dixie Gas and Electric Company. In each case, the issuance of stock of General and the payment of said amounts of cash were in exchange for all of the shares of each petitioner in each corporation.

The liabilities of Mills Gas and Appliance Company, Inc., Dixie Gas Distributors Corporation, and Dixie Gas and Electric Company were in excess of 20 percent of all their properties as of April 30, 1954, and July 26, 1954.

At the time of each such exchange the fair market value of the common voting stock of General was $17.50 per share.

At the time General exercised its option with respect to the capital stock owned by the petitioners in the Mills Gas and Appliance Company, Inc., Dixie Gas Distributors Corporation, and Dixie Gas and Electric Company, it also exercised options with respect to the capital stock owned by all of the other stockholders in said three corporations, and thereupon exchanged its common voting stock and cash in lieu of fractional shares for all of the stock of said three corporations owned by all of the stockholders of said three corporations. Immediately after these exchanges, General was in control of each of the three corporations, owning 100 percent of the capital stock of each.

On July 28, 1954, General liquidated Mills Gas and Appliance Company, Inc., Dixie Gas Distributors Corporation, and Dixie Gas and Electric Company. They were thereafter operated as district or branch offices of General and in one case as a division. General treated the transactions as purchases of assets and never listed the stock of the acquired corporations as assets on its books, although General did acquire all of the stock of such corporations prior to its liquidation of them.

Neither Mills Gas and Appliance Company, Inc., Dixie Gas Distributors Corporation, nor Dixie Gas and Electric Company filed an election under section 393(b)(3) of the Internal Revenue Code of 1954.

No information regarding a corporate reorganization was filed by petitioners with the director of internal revenue or attached to their 1954 income tax returns as a result of the transactions described herein.

The basis for determining gain or loss to each petitioner for the aggregate of the capital stock owned by him in the three corporations involved herein was $4,000.

OPINION.

Petitioners contend that they entered into a plan of reorganization as described in section 354(a)[3] and that their gain thereon is recog-

---

[3] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\* \* \* \* \* \* \*

(3) CROSS REFERENCE.—For treatment of the exchange if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

nized only to the extent provided by section 356(a).[4] Respondent contends that there was no plan of reorganization, and that in any event, there was no section 354 reorganization as defined by section 368(a),[5] with the result that section 356 is never reached.

A "plan of reorganization" need not be in writing. *James G. Murrin*, 24 T.C. 502 (1955); *William H. Redfield*, 34 B.T.A. 967, 973 (1936); *Hortense A. Menefee*, 46 B.T.A. 865 (1942). It is sufficient if the steps leading up to the consummated transaction evidence a plan. *Transport Products Corporation*, 25 T.C. 853, 858 (1956), affirmed per curiam 239 F. 2d 859 (C.A. 6, 1956). Referring to a plan of liquidation *Burnside Veneer Co.* v. *Commissioner*, 167 F. 2d 214, 217 (C.A. 6, 1948), affirming 8 T.C. 442, said that "A plan is a method of putting into effect an intention or proposal. The statute does not require a formal plan."

As was said in *Rawco, Inc., Ltd.*, 37 B.T.A. 128, 141 (1938):

The agreement constituted a plan of reorganization if the acts to be performed fall within the meaning of the term reorganization as defined by section 112 (i)(1), *supra*. The respondent places a great deal of importance upon the fact that the parties referred to the transaction as a sale in their supplemental agreement of May 19, 1930. We do not think the fact that they referred to it as a sale would change its nature or effect, nor operate to exclude it from the meaning of the statute if it would otherwise fall therein. *Weiss* v. *Stearn*, 265 U.S. 242. The important fact is that the transaction amounted to a reorganization within the meaning of the statute, and that it was entered into in pursuance of a plan. "The plan of reorganization was the contract made and performed." *Watts* v. *Commissioner*, 75 Fed. (2d) 981; affd., 296 U.S. 387.

A "plan" therefore, is merely the effectuated intention of the parties; for a plan to be a "plan of reorganization" the result must constitute a reorganization as defined in section 368(a)(1).

---

[4] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.
  (a) GAIN ON EXCHANGES.—
    (1) RECOGNITION OF GAIN.—If—
      (A) section 354 or 355 would apply to an exchange but for the fact that
      (B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,
    then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.
[5] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
  (a) REORGANIZATION.—
    (1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—
      \*     \*     \*     \*     \*     \*     \*
      (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);
      (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded; \* \* \*

Although the question may not be free from doubt, we assume, without deciding, that a "plan" did exist under the facts of this case and proceed to consideration of petitioners' claim that the transactions here fall within section 368(a)(1)(B) or (C). To be a (B) reorganization the acquiring corporation must exchange *solely* its voting stock for the stock of the acquired corporation and after the acquisition it must be in control of the acquired corporation. Respondent admits that General was in control of petitioners' corporations after the acquisition, but contends that the cash payments in lieu of fractional shares violate the "solely" requirement, and that resort to the *de minimis* rule sought to be applied by petitioners is unwarranted.

Respondent relies on *Helvering* v. *Southwest Corp.*, 315 U.S. 194 (1942), rehearing denied 315 U.S. 829, 316 U.S. 710. That case involved a (C) reorganization with $106,680 of boot.[6] The Supreme Court said (p. 198):

Congress has provided that the assets [or stock] of the transferor corporation must be acquired in exchange "solely" for "voting stock" of the transferee. "Solely" leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement. * * *

The Supreme Court held that the $106,680 was other consideration and alternatively that certain warrants issued were also not voting stock. The respondent argues that the presence of boot constituting less than one-tenth of 1 percent of the consideration furnished by the acquiring corporation is similarly "other consideration" preventing the transaction from qualifying as a (B) reorganization.[7]

In *Turnbow* v. *Commissioner*, 368 U.S. 337 (1961), the Supreme Court, in rejecting any nonrecognition in a stock-for-stock exchange where the boot constituted over 70 percent of the total consideration, noted (pp. 340–341):

By definition, contained in § 112(g)(1)(B), the term "reorganization" means "the acquisition by one corporation, in exchange *solely* for all or a part of its voting stock, of at least 80 per centum of the . . . stock of another corporation." * * * This type of reorganization is commonly called a "(B) reorganization."

There is no dispute * * * that the transaction involved was not a "reorganization," as defined in § 112(g)(1)(B), because "the acquisition by" Foremost was not "in exchange *solely* for . . . its voting stock," but was partly for such stock and partly for cash. *Helvering* v. *Southwest Consolidated Corp.*, 315 U.S. 194. * * *

---

[6] The 20-percent boot now allowable under section 368(a)(2)(B) was not allowable during the year involved in the *Southwest* case.

[7] The total consideration in the *Southwest* case was $752,000, although the fair market value of the assets was $1,766,694. Neither of these figures makes the boot of $106,680 seem *de minimis*.

Although the cash in *Turnbow* was certainly not *de minimis*, the Supreme Court emphasized the word "solely" in the above quotation, and we believe that that requirement is to be literally construed.

We have been cited to no case respecting section 368(a)(1) and involving a relatively small cash payment in addition to stock of the acquiring corporation, and we have found none. We note that in 1954 (20 years after the enactment of the predecessor of section 368(a)(1)(B)) Congress enacted section 355 (relating to spin-offs). Section 355(b)(1)(B) provides *inter alia* that the distributing corporations have *no* assets other than stock or securities of the controlled corporations immediately before the distribution of such stock or securities to the shareholders of the distributing corporation. Referring to the "no asset" requirement, the Senate Finance Committee said (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 268 (1954)): "It is assumed that in connection with the requirement of 'no asset' a de minimis rule will be applied." This assumption was crystallized by section 1.355-4(a)(2), Income Tax Regs.

In the light of the above we must examine the legislative history and purpose of section 368(a)(1)(B). Prior to 1934 no (B) or (C) reorganizations existed as such.[8] By 1934 the House Ways and Means Committee was aware that sales were being drafted in forms which satisfied the statutory definition of a reorganization. See H. Rept. No. 704, 73d Cong., 2d Sess., p. 13 (1934). A special subcommittee on "Prevention of Tax Avoidance" reported on December 4, 1933, that (H. Rept., Dec. 4, 1933, 73d Cong., 2d Sess., p. 39):

> The statute provides that upon the sale or exchange of property the entire amount of gain or loss shall be recognized, with certain exceptions. The exceptions are the exchange and reorganization provisions already referred to. If a taxpayer desires to take a loss, it is easy to arrange a transaction falling without the exceptions. On the other hand, if it is desired to pay no tax on the gain, the transaction can be so arranged as to come within the exceptions. In addition, losses from the sale or exchange of stocks and bonds are limited, to a large extent, to the gains from such sales or exchanges, so in many cases a stock or bond loss even if recognized could not be utilized by the taxpayer.

The House rejected the subcommittee's recommendation that non-recognition in reorganizations be completely eliminated, however.

The Senate Finance Committee stated (S. Rept. No. 558, 73d Cong., 2d Sess., pp. 16–17 (1934)):

> Your committee is in complete agreement with the purposes of the House bill which aim at tax-avoidance schemes in this connection. However, some modifications are recommended in order to bring about a more uniform ap-

---

[8] Section 112(i) of the Revenue Act of 1932 provided only for what is now an (A) reorganization—a merger or consolidation. But the quantity of stock acquired by one corporation need only have been a majority of the voting stock and a majority of total shares or substantially all the properties of another corporation.

plication of the provisions in all 48 of the States. Not all of the States have adopted statutes providing for mergers or consolidations; and, moreover, a corporation of one State cannot ordinarily merge with a corporation of another State. The Committee believes that it is desirable to permit reorganizations in such cases, with restrictions designed to prevent tax avoidance. Consequently, the committee recommends the insertion in the House bill of an addition to the definition of the term "reorganization" as follows:

"(B) the acquisition by one corporation in exchange solely for its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation;"

The committee believes that these transactions, when carried out as prescribed in this amendment, are in themselves sufficiently similar to mergers and consolidations as to be entitled to similar treatment. It will be noted that the proposed amendment requires that (1) the acquiring corporation must obtain at least 80 percent of the voting stock and at least 80 percent of the total number of shares of all other classes of stock of the other corporation, instead of only a majority as provided by the present law; and (2) the acquisition, whether of stock or of substantially all the properties, must be in exchange solely for the voting stock of the acquiring corporation.

This provision was enacted in 1934 as section 112(g)(1)(B), the statute involved in *Helvering* v. *Southwest Corp., supra.*

We construe the word "solely" as meaning precisely what it purports to mean, namely that the receipt by the stockholders of an acquired corporation of any consideration whatsoever other than voting stock forbids a transaction from being a reorganization as defined under section 368(a)(1)(B). That the Congress intended this result is made clear by its use of the words "substantially all" in this same section when dealing with properties of an acquired corporation. We cannot assume that Congress was incapable of expressing a grant of leeway when that was its purpose.

Congress enacted the predecessor of section 368(a)(1)(B) to allow taxpayers to choose nonrecognition of gain or loss by literal compliance therewith or to choose recognition of gain or loss by deviating slightly therefrom. Any other interpretation would turn that section into a guessing game.

Petitioners consulted tax counsel in connection with the option granted to General, and thereafter entered into the option agreement of May 20, 1954, which expressly provided that "the difference will be paid in cash." The resolutions passed by General's board of directors authorized exchanges for the common stock of General "*and other consideration.*" (Emphasis supplied.)

It has been suggested [9] that to avoid the seemingly necessary implications that " 'Solely' leaves no leeway" we treat the option agree-

---

[9] Rubenfeld, "Handle expenses, fractional shares, escrows, in reorganization with great care," 15 J. Taxation 66–68 (1961).

ment as giving petitioners fractional shares but simultaneously promising to redeem or sell them. Not only does this theory do violence to the step transaction doctrine and attempt to rewrite the option agreement, but it also disregards the rule that we look to what the parties actually did and not to what they might have done. In *Television Industries, Inc.* v. *Commissioner*, 284 F. 2d 322, 325 (C.A. 2, 1960), affirming 32 T.C. 1297, the Second Circuit said:

> It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less.

Many methods of casting their transaction into a nonrecognizable one were available to petitioners, but none of these was selected.

We note that where a taxpayer has a loss which he wishes to recognize, adding a minimal amount of other consideration to what would otherwise be a (B) reorganization will compel such recognition. We believe this is the result intended by Congress.

Petitioners rely on a statement in 3 Mertens, Law of Federal Income Taxation, sec. 20.89, p. 324, to the effect that a *de minimis* rule applies to (B) reorganizations. With due deference to the unquestioned expertise of the author and revisers of that treatise, we do not regard its unsupported fiat as persuasive of more than its preparers' opinion.

Petitioners claim that our decision in *Mountain Water Co. of La Crescenta*, 35 T.C. 418 (1960), supports their proposition that tax legislation is subject to a *de minimis* rule. In that case section 337 (providing for nonrecognition of gain or loss upon sales and exchanges made during certain liquidations) required "all" assets to be liquidated within a specified time "less assets retained to meet claims." Taxpayer retained cash as a reserve for possible taxes and an amount necessary to redeem one-tenth of 1 percent of the shares originally outstanding but not located at the close of the 12-month period of liquidation prescribed by the statute. We classified the events as a liquidation and treated the directors as trustees of the funds held to redeem the unsurrendered shares. Indeed it seems doubtful that the directors could have made a complete distribution without breaching their fiduciary duty.

The regulations provided for nonrecognition even in instances where funds were held for unlocated shareholders if the funds were transferred to one authorized by law to hold funds for such shareholders. *Mountain Water Co.* applied this regulation to corporate directors acting in good faith holding funds for unlocated shareholders.

In addition, the Senate Finance Committee, in S. Rept. No. 1622, 83d Cong., 2d Sess., p. 259 (1954), said that: "It is intended that all of the [liquidating corporation's] property except property retained to meet claims must be distributed by the corporation." The statute specifically provides for the retention of assets to meet claims. We held merely that the retention of funds in *Mountain Water Co.* was proper. We did *not* state that a retention of a *de minimis* amount of assets for purposes other than to meet claims would similarly not disqualify transactions which would otherwise be nonrecognized since made during a complete liquidation.

We do not believe that the cash payments in the instant case can be ignored. We hesitate to open a Pandora's box into a technical and intricate statutory pattern, an area in which the taxpayer, by choosing the form of his transaction, can control the tax results by falling within or without the definitions of a reorganization.

Petitioners also claim that a (C) reorganization in fact occurred. We do not so interpret the facts. However, since the exchange was not "solely" for General's stock, and since the assumed liabilities are sufficient to prevent the application of section 368(a)(2)(B),[10] petitioners would not prevail even if they are deemed to have sold assets instead of stock.

Petitioners' broader argument that the presence of any amount of boot in a stock-for-stock exchange does not preclude a finding of a plan of reorganization was considered and decided adversely to the taxpayer in *Turnbow* v. *Commissioner, supra.*

Reviewed by the Court.

*Decisions will be entered for the respondent.*

---

[10] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
  (a) REORGANIZATION.—
    (1) IN GENERAL.— * * *
      \*      \*      \*      \*      \*      \*      \*

    (2) SPECIAL RULES RELATING TO PARAGRAPH (1).— * * *
      \*      \*      \*      \*      \*      \*      \*

    (B) ADDITIONAL CONSIDERATION IN CERTAIN PARAGRAPH (1)(C) CASES.—If—
      (i) one corporation acquires substantially all of the properties of another corporation,
      (ii) the acquisition would qualify under paragraph (1)(C) but for the fact that the acquiring corporation exchanges money or other property in addition to voting stock, and
      (iii) the acquiring corporation acquires, solely for voting stock described in paragraph (1)(C), property of the other corporation having a fair market value which is at least 80 percent of the fair market value of all of the property of the other corporation,
    then such acquisition shall (subject to subparagraph (A) of this paragraph) be treated as qualifying under paragraph (1)(C). Solely for the purpose of determining whether clause (iii) of the preceding sentence applies, the amount of any liability assumed by the acquiring corporation, and the amount of any liability to which any property acquired by the acquiring corporation is subject, shall be treated as money paid for the property.

WITHEY, *J.*, concurring: I concur in the result herein but do so only because the option agreement of May 20, 1954, between petitioners and General is cast in terms of purchase and sale and results through General's exercise of the option in a purchase by that corporation and a sale by petitioners of petitioners' stock in Mills Gas and Appliance Company, Inc., Dixie Gas and Electric Company, and Dixie Gas Distributors Corporation. It appears to me from the option agreement that petitioners, their corporations, and General all originally considered the transaction constituted a purchase and sale of the stock, was never intended as an exchange of stock for stock, and that the gains or losses in connection therewith were intended to be immediately recognizable and that the present attempt to defer recognition is an afterthought.

BRUCE and FISHER, *JJ.*, agree with this concurring opinion.

---

TRAIN, *J.*, dissenting: Accepting the majority assumption that the option agreement was a part of a plan of reorganization rather than of an outright sale of stock, I do not believe the result reached by the majority is required by either the statute or the decided cases.

The two cases relied upon by the majority in support of its "literal" construction of the word "solely" as it is used in section 368(a)(1), namely, *Helvering* v. *Southwest Corp.*, 315 U.S. 194 (1942), and *Turnbow* v. *Commissioner*, 368 U.S. 337 (1961), both involved the receipt of consideration so plainly different from and in addition to voting stock that those cases are clearly distinguishable from that before us here.

In the instant case, the plan of reorganization provided solely for the exchange of voting stock. No other consideration was provided in the option agreement. Certainly none was intended. Reasonably enough, even inescapably, the agreement contained the proviso that, in the event the price was not evenly divisible by shares at $14 each, the fractional share problem was to be avoided by a payment in cash, which here amounted to $27.36. Had the price been evenly divisible by $14, only stock would have been exchanged, the terms of the option would have been complied with, and presumably the issue would have posed no problem for the majority.

I interpret the word "solely" as requiring that there be no *consideration* other than voting stock. Consideration in the accepted sense is an inducement to a contract, an impelling influence which induces a contracting party to enter into a contract. To construe here what was simply a mathematical rounding off as constituting additional consideration over and beyond the voting stock mocks the statute as well as the perfectly reasonable plan of the parties to the agreement.

In the latter connection, the majority opinion recognizes, as, indeed, do the congressional committee reports, that the reorganization provisions provide an area in which the taxpayer, by choosing the form of his transaction, can control the tax results by falling within or without the definitions of a reorganization. Despite apparent acceptance of this principle, the result reached here by the majority makes the consequences of tax planning turn upon the mere accident of an accounting procedure, substituting complete uncertainty for what were plainly intended to be predictable consequences.

I do not believe it necessary to decide whether there is a *de minimis* rule applicable to cases of this sort; nor, if there is, whether $27.36 is *de minimis* under the circumstances here present. In my opinion, the arrangement entered into and its actual implementation meet the test of "solely" when that word is reasonably construed in the light of the statutory framework and the circumstances of the case. It is too well-established to require citation of authority, that statutes should be reasonably interpreted in a practical and sensible light and that a construction leading to an unreasonable result should be avoided.

TIETJENS, PIERCE, MULRONEY, DRENNEN, and FAY, *JJ.*, agree with this dissent.