RICHARD W. PASTENE, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EUGENE STEFANAZZI, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4024–66, 4025–66.   Filed July 22, 1969.

*James A. Cuddihy* and *Herbert J. Korbel*, for the petitioners.
*John K. Antholis* and *William T. Hayes*, for the respondent.

652

## OPINION

The first issue is whether Norwich Fur Farm, Inc., satisfied the basic requirements of section 337 which permit, if certain conditions exist, the nonrecognition of gain or loss to a corporation from the sale or exchange of its property in a complete liquidation. Section 337(a) provides, in pertinent part, as follows:

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

As indicated above, the two basic requirements for qualifying for nonrecognition under section 337(a) are the adoption of a plan of liquidation and complete liquidation "less assets retained to meet claims" within the 12-month period beginning with the adoption of the plan. Respondent argues on brief that his "primary position is that Norwich never adopted a plan of complete liquidation pursuant to section 337(a) of the Code." This position is untenable.[3]

That there was a complete liquidation of Norwich in the fiscal year ended February 28, 1965, is beyond dispute. It is equally clear that this liquidation was pursuant to an adopted "plan of complete liquidation" as required by the statute. The only issue here on whether the requirements of the statute are met is whether there was the required statutory distribution to the stockholders "within the 12-month period beginning on the date of the adoption of such plan." This necessarily makes the date of the adoption of the plan important.

Petitioner makes some argument that the plan to liquidate was adopted on or after November 10, 1963. We think the preponderance of the evidence is that the plan to liquidate was adopted on November 1, 1963. The record contains the following documents: Minutes of

---

[3] In the answer respondent filed in this case (par. 8.D.) he alleged: "On November 1, 1963, a resolution was adopted by the shareholders [of Norwich] pursuant to a duly warned meeting for the purpose of winding up the affairs of the corporation and distributing the assets of the corporation to the shareholders. The plan of complete liquidation and dissolution was to be completed prior to October 31, 1964."

a meeting of the directors of Norwich dated November 1, 1963, which clearly outline a plan for complete liquidation to be completed no later than October 30, 1964; a certificate of dissolution filed on October 30, 1964, with the State of Vermont and signed by petitioners, which also indicates a plan was adopted to liquidate Norwich on November 1, 1963; the Norwich corporate income tax return filed for the taxable year beginning March 1, 1964, and signed by Pastene stating that a plan of liquidation was adopted on November 1, 1963; Treasury Form 966, required by section 6043 to be filed by a corporation after it has adopted a resolution of dissolution or of complete or partial liquidation, filed on October 30, 1964, which states on its face that a plan of complete liquidation was adopted by Norwich on November 1, 1963; and, finally, as late as November 12, 1965, Pastene and Stefanazzi signed a "Protest" letter to the Internal Revenue Service which states quite clearly that the "deadline for the liquidation was November 1, 1964."

It will be noted that the original plan as stated in the resolution of Norwich of November 1, 1963, provided for the retention of "a sum not to exceed $10,000 to be retained for the purpose of paying claims against the corporation." And the recitation in the minutes of the special meeting of the board on October 27, 1964, shows that a sum of not less than $9,500 and not more than $10,000 was being retained to pay taxes and other claims. Section 1.337–2(b), Income Tax Regs., provides, in part, as follows:

A corporation will be considered to have distributed all of its property other than assets retained to meet claims even though it has retained an amount of cash equal to its known liabilities and liquidating expenses plus an amount of cash set aside under arrangements for the payment after the close of the 12-month period of unascertained or contingent liabilities and contingent expenses. Such arrangements for payment must be made in good faith, the amount set aside must be reasonable, and no amount may be set aside to meet claims of shareholders with respect to their stock. * * *

Respondent makes what he calls on brief an "alternative" argument that if the liquidation plan was adopted on November 1, 1963, the corporation failed to distribute all its assets in complete distribution within the 12-month period ensuing after the adoption of the plan.[4]

We do not understand respondent to argue that the retention of around $10,000 beyond the 12-month period to pay known or anticipated liabilities would be unreasonable. It is stipulated that the corporation had liabilities on October 31, 1964, in the amount of $1,243.05. At any rate respondent's entire argument that Norwich did not distribute all of its assets in the 12-month period (save the amount being

---

[4] This was the only allegation of why sec. 337 did not apply that was asserted in respondent's answer.

held for anticipated claims) is based on his contention that the October 28, 1964, checks to the four stockholders did not constitute a timely distribution to the stockholders. Respondent argues no distribution resulted because the total of the four checks on the Windsor, Vt., bank in the amounts of $5,621, $4,312, $77, and $77, or a total of $10,087, exceeded the amount then on deposit ($1,389.66) in the corporation's checking account in the bank.

It is obvious that the intent and purpose of the four checks of October 28 was to accomplish the distribution ordered at the special meeting of the board of directors on the day before. At that time it was reported by the treasurer that the corporation had around $20,000 and the record shows less than $1,300 was deposited in the Windsor, Vt. bank and something over $4,000 deposited in each of four California savings and loan associations, sometimes referred to as the California banks in the record. The order and resolution of the special meeting was that around half of the money be disbursed to the stockholders as liquidation disbursements and the balance of around $9,500 or $10,000 be retained for contingent claims. No one depository had enough corporation money on deposit to pay the entire disbursement ordered at this special meeting. We feel that under the special facts of this case the checks represented a distribution to stockholders in further liquidation of the corporation. And the fact that sufficient money was not on deposit in the Windsor bank to cover the two larger checks until November 6 should not defeat the distribution or render it untimely. The corporation sent immediate withdrawal notices to the California banks to secure funds for deposit in the Windsor bank and when those funds arrived, they were immediately sent to the Windsor bank.

It is certain that the stockholders considered the checks as a liquidation distribution. They knew the funds of the corporation had been committed to pay the amounts of the checks by the special meeting of the day before. They knew that there was sufficient funds either in the bank or what amounts to "in transit" to cover all of the checks.

We said in *Bird Management, Inc.*, 48 T.C. 586, 593:

If there is an attempt to transfer assets by the corporation that would be effective as between it and its transferee, we know of no reason why such transfer would not qualify as a distribution under section 337. * * *

The October 28th checks to the stockholders must be considered in relationship to all of the other facts and circumstances showing a good faith liquidation under section 337. Here we have a corporation in the business of producing and selling mink pelts. There is adoption of the plan for liquidation on November 1, 1963, and that same day it delivered 142 live mink to the auction company to be sold. It sold

the rest of its live mink in the next month or two so that by January 9, 1964, it had disposed of all of its live mink. In addition, the corporation disposed of its entire stock of mink pelts by shipping them to the auction company in December of 1963. Thus, all of the corporation's operating assets had been disposed of within a few months after its adoption of the plan to liquidate. There was no further business operation of the corporation. After the corporation sold its realty in July of 1964, it possessed nothing but money. It was completely liquid. It had obligations incident to any winding up of a business and placing the bulk of its funds in savings accounts was consistent with good liquidating procedure as distinguished from business activity. The distribution of the checks to the stockholders in the last month of the liquidating year was the required formal corporate action to accomplish a distribution of its money down to the amount that was to be held for known and contingent claims. The fact that the checks might not operate as a legal assignment of funds in other banks is not significant. The treasurer took immediate steps to have funds in other banks placed in the Windsor bank to be subject to the checks. We said in *Mountain Water Co. of La Crescenta*, 35 T.C. 418, 426:

If all the facts and circumstances indicate that the assets were in fact sold as a part of a plan to liquidate the company and the corporation in fact goes out of business and distributes its assets in complete liquidation within the 12-month period, it would seem that that purpose has been accomplished. To read into the statute the requirement that formal legal steps be taken would tend to defeat the purpose of the statute rather than accomplish it.

We decide respondent's "alternative" argument in favor of petitioners. We hold the purpose of the statutory requirement that there be complete liquidation within a year from the adoption of the plan was fulfilled in this case. We hold that Norwich satisfied the basic provisions of section 337(a) and therefore should be granted nonrecognition at the corporate level on gains realized on the sale or exchange by it of "property" under section 337(a). However, section 337(b)(1) (A) provides that the term "property" in subsection (a) does not include:

(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business.

The corporation did business on a cash basis and did not use inventories. However, it is stipulated its principal business activity was "the sale of pelts of mink raised on its mink farm in Norwich, Vermont." At the time of the adoption of the plan to liquidate the corporation had no stock of mink pelts. It had in all 3,175 live mink. It proceeded to

sell 680 live mink which had value as breeding stock that was more than pelt value and the corporation pelted the remaining 2,495 mink and sold the pelts.

We are satisfied that the gain realized from the sale of the live mink was not excluded from nonrecognition under section 337(a). The live mink did not constitute inventory property or property held primarily for sale in the ordinary course of business. The breeder mink constituted property used in the business. The corporation was not in the business of selling live mink. But the same cannot be said with respect to the 2,495 mink pelts. They were the "stock in trade of the corporation" within section 337(b)(1)(A) even though the mink had not been pelted at the time of the adoption of the liquidation plan. They were animals being held for sale as pelts. The evidence shows that in the customary operation of the business such animals would be pelted before sale. The live animals were in reality a stock of mink pelts.

Petitioners argue that even if the pelts be treated as falling within section 337(b)(1)(A), the gain realized on the sale of the pelts should still be unrecognized. The argument is that the property sold was eligible for nonrecognition treatment by reason of the exception contained in subsection (b)(2) of section 337. That subsection provides, in pertinent part, as follows:

(b) PROPERTY DEFINED.—

\*     \*     \*     \*     \*     \*     \*

(2) NONRECOGNITION WITH RESPECT TO INVENTORY IN CERTAIN CASES.—Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term "property" includes—

(A) such property so sold or exchanged, and

The exception in the above subsection applies to the sale of inventory-type property only when the sale of such property is made in bulk to "one person in one transaction." Petitioners argue that the corporation by turning over its pelts to the auction company actually disposed of them in bulk in what amounted to a single transaction. Petitioners argue such disposition by the liquidating corporation satisfies the overall purpose of the statute even though there were several buyers of the corporation's pelts at the auction sales.

The overall purpose of the exclusion in section 337(b)(1) and the exception in (b)(2) with respect to sales of inventory stock in trade property is clear. It was not to allow the corporation's income, generated by the sales of such property in the ordinary course of its

business, to be eligible for nonrecognition merely because the inventory property was sold in the liquidating year and also to allow the sales of such inventory property when not made in the ordinary course of business to be eligible for nonrecognition if made in bulk to one person in one transaction. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 259; *Hollywood Baseball Association*, 42 T.C. 234.

The congressional intent is stated in this language from the above cited Senate report:

Paragraph (2) of subsection (b) provides a special rule which would include inventory within the term "property" in any case in which substantially all of the inventory is, under section 337, sold or exchanged to one person in one transaction. * * * It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating. * * *

And in *Pridemark, Inc.* v. *Commissioner*, 345 F. 2d 35 (1965) (affirming in part and reversing in part 42 T.C. 510), the court stated at page 45: "Congress, however, clearly indicated that it did not intend section 337 to be used as a device to avoid taxation on income generated by the normal operations of a business."

The evidence here shows without dispute that the corporation sold its inventory or stock in trade of mink pelts in the ordinary course of its business. For each of the 23 years of its existence the corporation had delivered its mink pelts to the New York Auction Co. and that company had sorted, graded, and bundled the pelts and sold the bundles to various buyers at auction sales. Sometimes the auction sales extended over 3 or 4 days. The auction company deducted its charges and commissions for its services and remitted the balance to the corporation. Pastene testified that he had done business with the auction company for 23 years and he said: "I never considered any other way of selling except through the Auction." The vice president of the auction company who handled the corporation business for all of its 23 years said there was no difference in the procedure as to the shipment, grading, sorting, bundling, and sale of the corporation's pelts in December 1963 through February 1964 than such procedure in any of the previous years. The auction company through which the corporation sold its mink pelts must be considered the corporation's selling agent. It follows that the inventory of pelts was not sold in bulk to one person in one transaction. The record shows the pelts were sold in the ordinary course of the corporation's business and therefore the amount realized from the sale of the pelts is not eligible for nonrecognition under section 337 and the income realized from the sale of the pelts is taxable to the corporation as ordinary income.

There is some question as to the year in which the corporation realized taxable income from the sale of its mink pelts. Respondent asserts such gain with the exception of the $10,000 advancement was realized during the taxable year ended February 28, 1965. Petitioners state on brief they are in "complete accord" with respondent's position as to time of the realization of such gain, subject only to their contention that no gain should be recognized.

*Decisions will be entered under Rule 50.*