Jessie B. Mitchell, et al., [1] v. Commissioner. Mitchell v. Commissioner
Docket Nos. 2545-69, 2599-69, 2600-69, 4351-69, 4352-69, 4353-69, 4381-69, 4392-69, 1550-70, 1551-70.
United States Tax Court
T.C. Memo 1972-219; 1972 Tax Ct. Memo LEXIS 38; 31 T.C.M. (CCH) 1077; T.C.M. (RIA) 72219; October 25, 1972
Leonard A. Marcussen, 1924 Broadway, Oakland, Calif., for the petitioners. Eugene H. Ciranni and David L. Gibson, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income tax as follows: Petitioner
Year
Deficiency
Jessie B. Mitchell Docket No. 2545-69
1965
$19,493.30
John R. Mitchell, deceased, by his surviving spouse and representative, Bon- nie Mitchell, and Bonnie Mitchell
Docket No. 2599-69
1965
11,392.26
Harry C. Allen and Velma N. Allen
Docket No. 2600-69
1965
9,590.12
Donovan J. McCune Docket No. 1550-70
1965
22,345.05
Dorothy M. Dicken Docket No. 1551-70
1965
11,206.06
*40 The Commissioner also determined a deficiency ($104,683.24) and an addition to tax ($26,170.81) for 1965 against the Elton Corporation, in respect of which he further determined that petitioners, as transferees of the assets of the Elton Corporation, were accordingly liable in the following amounts to the extent of the value of the property received by them: Petitioner
Transferee
Liability
Jessie B. Mitchell Docket No. 4353-69
$77,779.17
John R. Mitchell, deceased, by his surviving spouse and representative, Bonnie Mitchell, and Bonnie Mitchell
Docket No. 4382-69
58,334.38
Harry C. Allen and Velma N. Allen Docket No. 4381-69
58,334.38
Donovan J. McCune Docket No. 4352-69
77,779.17
Dorothy M. Dicken Docket No. 4351-69
38,889.59 1078 The primary issue for decision is whether the Elton Corporation complied with the provisions of section 337, I.R.C. 1954, and thereby did not itself recognize any gain as a consequence of the sale of a tract of land, which comprised the principal part of its assets, or cause petitioners in their individual capacities to recognize dividend income in respect of certain distributions to them. Cf. *41 section 331, I.R.C. 1954. Findings of Fact The parties have stipulated certain facts, which, together with the accompanying exhibits, are incorporated herein by this reference. All of the petitioners herein (as well as John R. Mitchell, deceased) were closely related or associated by blood, marriage or friendship and each held either individually or jointly stock interests in the Elton Corporation. Petitioners Jessie B. Mitchell, Donovan J. McCune and Dorothy M. Dicken each filed individual Federal income tax returns for the calendar year 1965 with the district director of internal revenue at San Francisco, California. Petitioners Harry C. Allen and Velma N. Allen are husband and wife, and they filed a joint Federal income tax return for 1965 with the district director of internal revenue at San Francisco, California. Petitioner Bonnie Mitchell and her husband, John R. Mitchell, also filed a joint Federal income tax return for 1965 with the district director of internal revenue at San Francisco, California. John R. Mitchell died on May 14, 1968, and Bonnie Mitchell is his representative herein. All of the petitioners resided in the State of California *42 at the time of the filing of their respective petitions herein. On November 28, 1955, petitioners [2] purchased 77.97 acres of undeveloped land located east of, and adjacent to the City of Petaluma, California (sometimes referred to hereinafter as the "City"), as tenants-incommon with the following individual interests and cost bases: Undivided
Interest
Basis
Jessie B. Mitchell
4/16
$17,632.93
Bonnie Million (later Mitchell)
3/16
16,974.66
Harry C. and Velma N. Allen
3/16
$16,974.66
Donovan J. McCune
4/16
22,632.90
Dorothy M. Dicken
2/16 11,316.45
Total Cost Basis
$85,531.60 As already noted above, and at the time of the purchase of the 77.97 acres of land (referred to hereinafter generally as the "Petaluma Gardens property" or the "property"), all of the petitioners were closely related to each other by blood, marriage or friendship. In the spring of 1956, after the purchase of the property, petitioner Bonnie Mitchell (then Bonnie Million) married John R. Mitchell ("Mitchell"), who was not involved in the initial purchase of the Petaluma Gardens property. Mitchell was a general building contractor and he had had experience in real estate *43 transactions over a number of years. On March 7, 1962, several of the petitioners, acting as incorporators and designating themselves the first directors, caused the Elton Corporation ("Elton" or the "corporation") to be organized under the laws of the State of California for the purpose of subdividing and developing the Petaluma Gardens property. The Articles Of Incorporation for Elton, which were filed with the Secretary of State of California also on March 7, 1962, authorized 200 shares of $100 par value common stock, and provided in respect of the business of the corporation as follows: The specific business in which the corporation is primarily to engage is the purchase, development *44 and improvement of unimproved real property for resale. The first meeting of Elton's board of directors was held on April 29, 1962, at the home of Bonnie and John R. Mitchell. At the meeting the directors elected Mitchell, who was otherwise the predominant moving force in all the transactions described herein, as president of the corporation, and petitioner Jessie B. Mitchell as Elton's secretary. The minutes of the meeting, which were prepared by an attorney who had advised petitioners and Mitchell in respect of the incorporation of Elton, disclosed that the directors adopted by-laws for the 1079 corporation and designated the office of the Petaluma Travel Agency, which was owned and operated by Jessie B. Mitchell, to serve also as Elton's principal office. Pursuant to the adopted by-laws, the annual meetings of Elton's stockholders were to be held at the office of Jessie B. Mitchell's travel agency, and the quarterly meetings of the board of directors at the home of John R. and Bonnie Mitchell. In addition to the above meeting of Elton's directors on April 29, 1962, the board of directors also met in a special meeting on the same date and adopted several resolutions relating *45 to the issuance of shares and the corporation's proposed acquisition of the Petaluma Gardens property. Pursuant to these resolutions Elton filed an application with the Division of Corporations of the State of California ("Division of Corporations") seeking permission to issue and sell 16 of its 200 shares of authorized $100 par value stock to petitioners and Mitchell, and to execute a promissory note and deed of trust in the amount of $320,000 for the Petaluma Gardens property. The application disclosed that the $320,000 promissory note and deed of trust were to be subordinated to a subsequent note and deed of trust in respect of a $100,000 loan to be obtained by Elton in order to finance the first phases of development and improvement of the Petaluma Gardens property. In May and June, 1962, Elton thereupon duly issued for cash the 16 shares of stock to the persons designated in the application filed with the Division of Corporations, as follows: No. of
Shares
Price
Jessie B. Mitchell
4
$ 400
John R. and Bonnie Mitchell
3
300
Harry C. and Velma N. Allen
3
300
Donovan J. McCune
4
400
Dorothy M. Dicken
2 200
$1,600 The stock certificates *46 thus issued were placed in escrow with the attorney who had advised petitioners and Mitchell in respect of Elton's incorporation. The record does not disclose what became of the stock certificates thereafter. On May 28, 1962, petitioners conveyed the Petaluma Gardens property by grant deed in Elton. The deed, however, was not acknowledged or recorded until the following year, as described hereinafter. Beginning in 1962, Elton engaged in various activities in preparation for the development and subdivision of the Petaluma Gardens property. The $1,600 in cash paid by petitioners and Mitchell for their Elton stock was deposited, along with an additional $50, the source of which is undisclosed by the record, to the corporation's account at the Bank of America, Vallejo, California, Branch and disbursed for corporate purposes. This account was subsequently closed in early 1963. Around February 13, 1963, Mitchell suffered a serious heart attack for which he was hospitalized. Although his health was not good thereafter, upon his recovery he once again undertook several activities directed toward Elton's development of the Petaluma Gardens property. In March and April, 1963, the petitioners *47 acknowledged the grant deed by which they conveyed the Petaluma Gardens property to Elton on May 28, 1962, and the deed was subsequently recorded on April 24, 1963. In consideration for the Petaluma Gardens property Elton delivered its interest-bearing promissory note, dated April 2, 1963, in the amount of $320,000 payable to petitioners and Mitchell. The corporation secured the note by execution of a deed of trust on the property naming the payees of the note as beneficiaries. Although Mitchell was not himself one of the original purchasers of the Petaluma Gardens property, through an inadvertency of the title insurance company which handled the conveyance to Elton, he was named both as a payee of the $320,000 promissory note and as a beneficiary of the deed of trust jointly with his wife, Bonnie Mitchell, who was one of the original purchasers. The parties have stipulated that the transaction in which the Petaluma Gardens property was conveyed to Elton was governed by the provisions of section 351, I.R.C. 1954, and that consequently the total cost bases of the shares in Elton of the various petitioners and Mitchell include both the consideration paid for the *48 stock and the cost bases of the property conveyed, as follows: Cost Basis of
Stockholder
Elton Shares
Jessie B. Mitchell
$18,032.93
John R. and Bonnie Mitchell
17,274.66
Harry C. and Velma N. Allen
17,274.66
Donovan J. McCune
23,032.90
Dorothy M. Dicken 11,516.45
$87,131.60
Elton never made any payments of interest on the $320,000 promissory note, and it made only one payment against principal, in the amount of $500, in connection with obtaining a partial release of a portion of 1080 land from the lien created by the deed of trust securing the note. The corporation obtained such release in order to make a sale of a small parcel of land, as described hereinafter. At a meeting of Elton's board of directors on April 7, 1963, Mitchell informed the directors that the Division of Corporations had approved the corporation's application, and he explained that it was necessary to hold the certificates of stock, representing the shares, in escrow. As proposed in Elton's application to the Division of Corporations, the corporation then obtained a loan commitment of $100,000 for development purposes from the Redwood Empire Savings & Loan Association *49 ("Redwood Empire") on April 17, 1963, in return for which Elton delivered to Redwood Empire a promissory note in that amount secured by a deed of trust on the Petaluma Gardens property. Although such loan commitment was for $100,000, Redwood Empire was called upon to make periodic advances to Elton in respect thereof in the total approximate amount of only $43,336.76. Also, the $320,000 promissory note and deed of trust in favor of petitioners and Mitchell, although prior in time, were subordinated to the note and deed of trust in respect of the Redwood Emppre loan commitment, as had also been proposed in Elton's application to the Division of Corporations. A first advance of $25,000 was made to Elton against the $100,000 loan commitment sometime in April, 1963, and such $25,000 was deposited to a new checking account opened by Elton at the Wells Fargo Bank ("Wells Fargo") at Vallejo, California, on April 26, 1963, from which corporate disbursements were made. In many instances Mitchell advanced his own personal funds on behalf of Elton and arranged for the corporation to reimburse him at a later date. The minutes of the meeting of Elton's board of directors on June 23, 1963, disclosed *50 that an architectural committee, consisting of Mitchell, Jessie B. Mitchell and Bonnie Mitchell, was appointed, and that Mitchell was otherwise authorized to act as general contractor for the corporation and to be separately compensated therefor on the basis of cost plus six percent. The June 23, 1963, minutes also reported that the directors approved immediate disbursement of $2,500 to Mitchell for various preliminary arrangements in respect of the planned development of the Petaluma Gardens property. Aside from the minutes for Elton's board of directors meetings on April 29, 1962, April 7, 1963, and June 23, 1963, described hereinabove, the only other records in Elton's minute file were notations that proposed meetings on March 4, 1963, and June 3, 1963, were adjourned for lack of requisite quorums. The minute file contained no other corporate minutes although the directors held additional informal meetings in respect of the corporation's affairs. And the only other record of any action by Elton's board of directors was a resolution of January 10, 1965, pertaining to Elton's ultimate sale of the Petaluma Gardens property, as explained hereinafter. The failure of the corporation *51 to keep corporate minutes was related to and arose from Mitchell and the petitioners' almost complete lack of experience in and knowledge of corporate matters. Mitchell, who acted as Elton's president and manager, as well as its general contractor, exercised total control over the corporation's affairs, and petitioners, who were variously Elton's other directors, officers and shareholders, had great confidence in his management of the corporation's activities. The directors and shareholders held very few group meetings, and those meetings, which were held, were informal gatherings. Rather, the close relationship of the parties interested in Elton, as well as the confidence all the petitioners shared in Mitchell's management, allowed Mitchell to confer with the directors and shareholders of the corporation individually and advise them of the course he was taking. Aside from Mitchell, only his wife, Bonnie, had had any significant experience in real estate transactions, and her experience was limited to the ownership and management of a few residential properties for rental purposes. Throughout the history of the corporation's affairs there was consequently virtually total reliance *52 on Mitchell's judgment and universal consent to the recommendations he made. Mitchell, for his own part, did not maintain precise or detailed accounting records either for his personal affairs or in respect of the transactions he conducted on Elton's behalf, and the corporation itself consequently also maintained no formal books and records relating to its activities. At one point in 1963, Mitchell did undertake to set up an accounting journal and ledger 1081 on behalf of the corporation, and entries were made thereto on June 15, 1963. But Mitchell abandoned this system and no entries were made after the June 15, 1963, date. He did, however, maintain a book of cancelled check stubs, cancelled checks and the bank statements pertaining to the corporation's checking account at Wells Fargo. Although Mitchell did not maintain books of account in his management of the corporation's affairs, because of the close interrelationship of all the parties interested in Elton and petitioners' confidence in Mitchell, the other directors and shareholders never requested an audit of Elton's accounts or complained of the personal and informal method by which Mitchell managed the corporation. *53 Moreover, although petitioners and Mitchell secured certain legal counsel at the time Elton was incorporated (including the advice of a firm of tax attorneys in respect of the corporation's acquisition of the Petaluma Gardens property), as well as the assistance of legal counsel in drafting certain correspondence to the City of Petaluma in connection with the corporation's ultimate sale of the property, Elton otherwise did not receive legal assistance in respect of the transaction here in issue or generally in relation to the corporation's other affairs. As part of the preliminry activities undertaken by him, Mitchell employed Gordon Buck ("Buck") as foreman and carpenter on the Petaluma Gardens project. Buck, who had previously worked periodically in Mitchell's construction business over a number of years, was to oversee the construction of homes on the property. Buck initially supervised the destruction of an old farmhouse situated on the land, and the construction of a small work shack. In addition, the property itself was otherwise prepared for development by the removal of weeds from the land. When petitioners, as individuals, originally purchased the Petaluma Gardens property *54 in 1955, the sellers had harvested hay on the land, and this practice was continued for a few years thereafter on a sharecropping basis from which petitioners each realized some income. And there is some indication on the record that the corporation itself, after it came into existence in 1962, may have received some income in 1964 from the sale of hay relating to the clearing of the land for development. Mitchell himself arranged for soil reports and engineering surveys, and the preparation of a tentative subdivision map. He also began negotiations with authorities of the City of Petaluma for annexation of the property, as well as with officials of both the City and Sonoma County in respect of proposed lot sizes, street locations, and the construction and financing of sewers and other utilities. While these negotiations were in process, it was decided that Buck should reside on the Petaluma Gardens property to better exercise his supervisory duties. Accordingly, from around September to December, 1963, Elton financed the construction of one house on a parcel of the Petaluma Gardens property - for which the corporation had specifically obtained the release from the $320,000 deed *55 of trust, as described hereinabove -, and thereupon sold the house (the "Buck house") and lot (consisting of an area 60 feet by 100 feet, and sometimes referred to hereinafter as the "Buck lot") to Buck for $22,000. The house itself was actually constructed under Mitchell's contractors license by Buck and two other carpenters employed by Mitchell. At least part of the expenses in constructing the Buck house were paid initially by Mitchell, and he was then reimbursed by the corporation in his capacity as Elton's general contractor. Although the design of the house was subject to Mitchell's general approval, it was built to Buck's specifications and was not a sample home of the type Elton anticipated constructing on the property. In respect of the $22,000 purchase prtce for the house, Buck paid $4,000 cash and borrowed the remaining $18,000 from Redwood Empire for which he gave his promissory note secured by a deed of trust (hereinafter referred to as "the Buck note and deed of trust"). Net of nominal escrow costs charged to Elton, $2,500 of the purchase price was deposited to a special account in the name of the corporation at Redwood Empire as security for Elton's commitment to construct *56 a paved road to the Buck house (hereinafter referred to as the "Buck road account"), and the remaining balance to another account at Redwood Empire for Elton's general use. In late October, 1963, at about the same time the foundation was poured for the Buck house, Mitchell and his wife, Bonnie, contemplated constructing a home for themselves on the Petaluma Gardens property to facilitate Mitchell's management of the proposed development project, and a second foundation was therefore also laid. But the Mitchells never built on the 1082 property inasmuch as development of the Petaluma Gardens property never came into being, as hereinafter explained. And no other homes, aside from the Buck house, were built on the property by or for Elton. Mitchell's negotiations with the City of Petaluma centered on the construction of a sewer line to the Petaluma Gardens property. The City demanded as a condition that Elton first replace 4,000 feet of existing sewer, serving certain adjacent property, at an estimated cost to the corporation of $70,000. Elton refused this demand and the negotiations reached an impasse. The record does not clearly disclose the connection, if any, between such *57 negotiations relating to the construction of a sewer line and the City's failure to otherwise approve Elton's proposed subdivision map, but the corporation also never secured authorization of the plat. As a consequence of the absence of an approved subdivision map, which included a designation of street locations, it was not possible either to pave a permanent road to the Buck house or to equip it specifically with the usual utility services except electricity. Access to the house was by means of a temporary gravel road. A butane storage tank was installed on the property for heating, and a septic tank for sewage disposal. Water was supplied to the house by a plastic pipe, which was connected to a meter located 1,000 feet away that had previously served the demolished farmhouse. All of these factors made it expensive for Buck to maintain the house. In early March, 1964, Buck informed Mitchell of the costliness of heating the house, and inquired as to whether it was probable that utility lines would be installed to service the property. At this point in time, Mitchell, who was having difficulties in his negotiations with the local authorities, was not optimistic about the possibility *58 of such installations and so stated to Buck. Later in March, 1964, Buck asked Mitchell whether there would be any objection to Buck's selling the house, and Mitchell stated that he had none at all. In this respect, aside from the expense of maintaining the house, Buck also considered that there was no likelihood of construction on the property, and he had begun to work in the area of Vallejo, California, some distance away. Buck listed the house for sale but was unsuccessful in finding a buyer because the property was not serviced by the standard utilities. Elton pursued its prospects of developing the Petaluma Gardens property into the spring of 1964, and the corporation made further draws on its $100,000 loan commitment from Redwood Empire on October 31, 1963, December 3, 1963, and April 29, 1964, in the respective amounts of $10,000, $5,000 and $3,000. However, Mitchell's negotiations with the City of Petaluma in connection with procuring the necessary permits for the Petaluma Gardens project, including the difficulties he experienced in reaching an agreement with the City concerning the installation of a sewer line to the property, ultimately proved to be a strain on his health. *59 In addition, he considered that the overall project would require an investment which was beyond the means of Elton's shareholders, and that he and petitioners were getting too old to undertake such a difficult and large endeavor. As a consequence of these considerations, Mitchell decided in the spring or summer of 1964 that he could not continue with the subdivision and development of the Petaluma Gardens property and that Elton should put the entire property on the market for sale. When Mitchell reached this decision it was generally understood by several of the petitioners that Elton would be liquidated, incident to the sale of the property, as there then would be no necessity for the corporation. But Mitchell and petitioners did not finally decide to liquidate the corporation until October 10, 1964, as described hereinafter. In May, 1964, Mitchell discussed the sale of the Petaluma Gardens property with Lawrence Rosasco ("Rosasco"), a realtor doing business under the name of Marinoma Realty, and informed Rosasco that the property was for sale as one parcel of land. In response to a request from Rosasco, sometime after June 16, 1964, Mitchell prepared a detailed description of *60 the property and the terms of the sale that Elton desired. Such description disclosed that Elton had previously conveyed a parcel of the property 60 feet by 100 feet to Buck, and that $2,500 was on deposit at Redwood Empire in a "'blocked' account" for the construction of a road to the Buck house, as described hereinabove. The description also set forth the following information: A preliminary or tentative map is on file with the City of Petaluma and a final map is ready to file when arrangements 1083 are complete for a trunk sewer line to McDowell Road. * * * Our policy is to have full release of any land by cash. No subordination to construction or other indebtedness. In other words, any buyer would clear present owners before starting operations. The down payment would entitle a buyer to a release of land clear of debt. The amount to be subject to agreement. * * * * * * The firm of Sarles, Breelje and Race * * * [engineers] will transfer all records, etc. to any new owner. The engineering for the sewer is complete. The cost is estimated to be around $32,000.00. This amount will be recovered in part either by cooperation with the owners of the other land or by contract *61 with the City of Petaluma. In respect of the terms of the proposed sale, Elton requested an offer of $350,000 for the property with a down payment of $100,000 and the remaining balance to be paid in four equal annual installments. Around September 26, 1964, Rosasco obtained an offer for the Petaluma Gardens property from C.B. & D. Corporation ("C.B. & D."). The C.B. & D. offer provided for a purchase price of $365,000, which covered the entire Petaluma Gardens property without exclusion of the plot already conveyed by Elton to Buck, and also for payment of such amount over an eight-year period and not the shorter period specified in the description of the property that Elton had prepared for Rosasco. This offer, however, was rejected by Mitchell. Thereafter, C.B. & D. presented a second offer, which was negotiated by Rosasco and Sidney Garfield ("Garfied"), the sole stockholder and chairman of the board of directors of C.B. & D. The second offer was on a printed "Deposit Receipt" from dated October 5, 1964. Like the first C.B. & D. offer, it did not provide for exclusion of the parcel of the property already conveyed to Buck; but it did conform to requirements Mitchell set forth *62 in respect of the time period in which the purchase price was to be paid. The terms which C.B. & D. proposed for the sale and purchase of the property comprised eight separately numbered items, one of which provided that the transaction was contingent on an engineering study satisfactory to C.B. & D. to be made within 90 days. On behalf of C.B. & D., Garfield and a person named Vadon signed the "Deposit Receipt" incorporating the offer, and delivered a check to Rosasco in the amount of $36,500, the sum specified as the buyer's deposit into escrow and as part of the down payment of $91,250 to be made on the property under the terms of the offer. On the evening of October 5, 1964, Rosasco along with Vadon presented C.B. & D.'s offer to Mitchell, who told Rosasco he would retain the "Deposit Receipt" for the signatures of Elton's stockholders, but that he did not agree to all the terms contained therein. Prior to meeting with petitioners on October 10, 1964, as described hereinafter, and sometime before October 7, 1964, Mitchell presented to Rosasco certain modifications for Garfield's consideration. Such modifications pertained primarily to: the requirement that parcels of the property *63 would be released from the deed of trust to be given by C.B. & D. only upon payment of installments of the purchase price, the subordination of the seller's deed of trust to financing required for "off site" improvements (streets, sewers, utilities, etc.), the buyer's acceptance of an agreement Elton had apparently reached by this time with the City of Petaluma on the installation of a sewer line, and the joint financial responsibility of Elton and C.B. & D. in respect of the removal of the Buck house which, as a first step, was to be purchased by Elton for resale. The principal difference between Elton and C.B. & D. in their negotiations related to the disposition of the Buck house and the responsibility therefor. The house was situated on ground which C.B. & D. had designated as a main access road, under its own subdivision map for proposed development of the property. C.B. & D.'s offer related to the entire Petaluma Gardens property. Garfied took the position that the house had to be removed and that C.B. & D. would assume no responsibility in this connection, or with respect to the note and deed of trust on the Buck house and lot. Moreover, he preferred that the Buck house not *64 be moved to another location on the Petaluma Gardens property because its design was not in harmony with C.B. & D.'s proposed development of the property Mitchell, on the other hand, insisted that C.B. & D. and Elton share equally in the financial responsibility of removing the Buck house from the aforementioned location on the Petaluma Gardens property. Accordingly, on October 7, 1964, when he signed a document approving Mitchell's other modifications, Garfield altered Mitchell's 1084 proposed changes in respect of the Buck house to omit any financial responsibility on C.B. & D.'s part. On the basis of these alterations made by Garfield, Mitchell again rejected C.B. & D.'s offer, leaving that aspect of the proposed sale and purchase of the Petaluma Gardens property open to further negotiation. Petitioners were aware of Mitchell's negotiations with C.B. & D. when he called them to a meeting at his home on October 10, 1964. The meeting lasted two or three hours, and all the petitioners were in attendance except Dorothy D. Dicken who had been injured in an automobile accident the day before. At the meeting Mitchell presented the October 5, 1964, "Deposit Receipt" incorporating *65 C.B. & D.'s offer for the Petaluma Gardens property, and it was discussed in some detail. Mitchell recommended that Elton accept the C.B. & D. offer subject to further negotiations in respect of the Buck house. He further suggested that the corporation be liquidated as soon as possible, and outlined proposals by which this result could be achieved. Under Mitchell's plan, Elton would distribute to its stockholders - after payment of the corporation's obligations, which included the indebtedness on the loan commitment of $100,000 from Redwood Empire in the approximate amount of $43,336.76 (see supra, pp. , ) , the cash it received out of escrow, representing the down payment on the property, as well as its other funds (but not the approximately $2,500 in the Buck road account). In addition, the note and deed of trust in respect of the remaning balance on the purchase price of the property would be made payable individually to the stockholders of the corporation and not to Elton itself. Mitchell also informed petitioners that C.B. & D.'s offer related to the entire Petaluma Gardens property without exclusion of the parcel already conveyed to Buck, and that the matter of the costs related *66 to the required repurchase of the Buck house and lot and the removal of the house from its location were still under negotiation. In respect of the reacquisition, removal and sale of the Buck house, neither Mitchell nor petitioners anticipated that any profit could result therefrom. Mitchell, however, stated that whatever contribution was received from C.B. & D. in respect of removing the Buck house would also be distributed to them individually and not to the corporation. As with most of the meetings of the parties interested in Elton, this meeting was informal and no minutes were taken. However, the record discloses that all the petitioners who attended the October 10, 1964, meeting unanimously approved and agreed to both Mitchell's recommendations in respect of the sale of the Petaluma Gardens property and his proposals for the liquidation of the corporation. The petitioners present at the meeting together with Mitchell, constituted, pursuant to Elton's by-laws, a majority of the directors and a "majority of stock" of the corporation, sufficient in either capacity for the transaction of corporate business. And they all signed the "Deposit Receipt" as follows: Mitchell and Jessie *67 B. Mitchell on behalf of Elton, and Velma N. and Harry C. Allen, Donovan J. McCune, and Bonnie Mitchell as ratifying stockholders. Petitioner Dorothy M. Dicken, who did not attend the meeting, was advised of Mitchell's recommendations and gave her oral approval. The October 10, 1964, meeting was conducted solely by the parties in attendance, and no lawyers were present. Moreover, as mentioned hereinabove, Elton did not receive any legal assistance, including tax advice, in respect of the matters discussed at the meeting or the transactions to which they related. On October 12, 1964, Mitchell delivered the "Deposit Receipt", which constituted a contract of sale of the entire Petaluma Gardens property between Elton and C.B. & D., with the above-mentioned signatures, to Rosasco who deposited it into escrow on the same date with the Redwood Empire Title Company (hereinafter referred to as "Redwood Title"). At a later date Rosasco also deposited into escrow the $36,500 check given to him by Garfield on October 5, 1964, together with the remaining balance on the down payment of $91,250. As deposited into escrow, the "Deposit Receipt" contained two provisions which were not a part thereof *68 at the time Garfield signed the document on October 5, 1964, one of which read: "THIS AGREEMENT IS VALID WITH ATTACHED AMENDMENTS." The record, however, does not disclose when these provisions were added to the "Deposit Receipt". Sometime after October 12, 1964, Elton and C.B. & D. executed an "Additions To 1085 Purchase Agreement On Petaluma Gardens" (hereinafter referred to as the "Additions Agreement"), which became a part of the contract of sale embodied in the "Deposit Receipt". The Additions Agreement provided for all the modifications Mitchell had proposed just prior to October 7, 1964, as described hereinabove, but also incorporated into Mitchell's original proposal for removal of the Buck house the following provision in respect of $2,500 that was on deposit under Elton's name at Redwood Empire in the Buck road account: It is agreed that Elton Corporation shall purchase the home. Price approximately $23,000.00. This house shall be moved at buyers option to a location in this tract satisfactory to buyer and with utilities and street installed. Primary consideration is that if house is moved it shall be located where it is readily saleable. Moving cost to be borne by *69 seller, job to be done by buyer. Buyer and seller to agree on sale and divide loss or profit. The sum of Twenty Five Hundred Dollars ($2500.00) is now on deposit with Redwood Empire Savings and Loan as guarantee of installation of streets and utilities. This sum becomes property of buyer on letting of contract for said "off site improvements". In event Buck house is moved, buyer shall trade new site plus the $2500.00 deposit for old site on even exchange. On October 1, 1964, just prior to the meeting of October 10, 1964, Elton's assets consisted of the Petaluma Gardens property (less the parcel previously conveyed to Buck) having a value of approximately $365,000, funds in the amount of $755.07 on deposit in Elton's checking account at the Wells Fargo Bank, $2,581.70 (including interest) in the Buck road account, and $17,016.01 in Elton's general account at Redwood Empire. The corporation's principal liabilities consisted of the note and deed of trust in the amount of $319,500, payable to petitioners and Mitchell in respect of Elton's acquisition of the Petaluma Gardens property, and the note and deed of trust covering draws of approximately $43,336.76 against the loan commitment *70 of $100,000 from Redwood Empire, described above. In order to carry out the contract of sale with C.B. & D., which covered the entire Petaluma Gardens property without exclusion of the parcel previously conveyed to Buck, Elton repurchased the Buck house and lot for $23,000 on November 12, 1964. In respect of the purchase price Elton paid $2,500 in cash, gave Buck its promissory note in the amount of $2,461.07, which it ultimately discharged with interest on January 17, 1965, and assumed the balance of the Buck note and deed of trust in favor of Redwood Empire in the amount of $17,770.15. To provide funds for the initial cash payment on the Buck house Elton transferred $2,500 from its general savings account at Redwood Empire to its Wells Fargo checking account. On December 3, 1964, the corporation made a similar transfer of $2,000 to provide funds for current disbursements, and finally closed out the saving account by transferring the remaining balance of $12,667.77 into the checking account on January 12, 1965. The purchase of the Buck house and lot posed no problem for Elton. As indicated hereinabove, Buck had already put the house on the market for sale, but was unsuccessful in *71 finding a purchaser. In connection with Elton's sale of the property to C.B. & D., Mitchell and petitioner in January, 1965, cancelled the promissory note (the remaining balance of which was $319,500) payable to them by Elton in respect of the corporation's acquisition of the Petaluma Gardens property in 1962 or 1963, and executed a reconveyance nullifying the deed of trust securing the note. Also in January, 1965, Elton and C.B. & D. proceeded to arrange for the conveyance of the Petaluma Gardens property. On January 8, 1965, Elton filed escrow instructions, pertaining to the sale of the property, with Redwood Title; pursuant to such instructions pro-ration of taxes in respect of the property was to occur on January 13, 1965. The corporation's records included a copy of a resolution of its board of directors on January 10, 1965, authorizing Mitchell to execute all the documents necessary to convey the Petaluma Gardens property to C.B. & D. As mentioned hereinabove, such resolution was the only other record of any action by Elton besides the corporate minutes previously described. Thereafter, on January 11, 1965, Elton executed a grant deed conveying the Petaluma Gardens property *72 (but not the parcel previously conveyed to Buck that had been subsequently reacquired by the corporation) to C.B. & D. On the same day, C.B. & D. executed an installment promissory note in the amount of $273,750 payable to Mitchell and the petitioners, individually, in proportion to their stock ownership in Elton, as had been agreed at the October 10, 1964, meeting, described hereinabove, in connection with the decision to liquidate the corporation. C.B. & D. similarly executed a deed of 1086 trust (the "C.B. & D. deed of trust"), securing the note, which also named Mitchell and petitioners, individually, as beneficiaries thereunder, and not the corporation. The deed of trust covered the Petaluma Gardens property, including the parcel on which the Buck house stood although this lot was not conveyed to C.B. & D. under Elton's grant deed, but excluding a 20 acre parcel which was released to C.B. & D. in respect of the down payment on the property. It also contained a provision relating to releases therefrom which was similar to one in the "Additions Agreement". In connection with the conveyance of the Petaluma Gardens property to C.B. & D., Elton secured certain legal services *73 in drafting two letters to the planning commission and mayor and city council of the City of Petaluma informing them of the sale of the property. These letters dated January 7, 1965, read in part as follows: Under existing California law, as regards the property secured by the deed of trust, in the event of default of payment of the purchase price, the sole remedy of our client or the existing beneficiaries would be to foreclose and take back title to such property. In such event, it would be the desire of our client to develop said property, or to again offer it for sale. From an abundance of caution, we ask that in your consideration of any tentative or final map for said parcel [offered by C.B. & D.], that it might be understood that neither our client, the Elton Corporation, nor the beneficiaries under the existing Deed of Trust, would not be bound by any commitments or offers made by the C.B. & D. Corporation as to any land secured by deed of trust in favor of our client until the payment of the purchase price thereon. In addition, Elton also secured the services of a firm of engineers to verify a description of the property conveyed. In both instances, the fees for these *74 services were paid initially by Mitchell, who was later reimbursed by the corporation on February 13, 1965. On January 13, 1965, the grant deed and the C.B. & D. deed of trust were recorded, and the net balance of the cash, due to Elton out of the escrow of the property, in the amount of $40,516.69 (as adjusted by a subsequent refund by the corporation to Redwood Title for conveyancing fees), was paid to the corporation and deposited to its checking account at Wells Fargo. As Mitchell and petitioners had also agreed at the October 10, 1964, meeting, in connection with the liquidation of Elton, the cash received out of escrow, together with other funds in the corporation's Wells Fargo checking account, was distributed on January 13, 1965, to Mitchell and petitioners in proportion to their stock interest in the corporation, as follows: Amount
Distrib-
Stockholder
Shares
uted
Jessie B. Mitchell
4
$12,129.17
John R. and Bonnie Mitchell
3
9,096.88
Harry C. and Velma N. Allen
3
9,096.88
Donovan J. McCune
4
12,129.17
Dorothy M. Dicken
2 6,064.59
Total
$48,516.69 At the end of January, 1965, after certain other disbursements from the *75 Wells Fargo checking account, including a $200 payment reimbursing Mitchell for certain expenses, incurred by him in connection with the demolition of the work shack on the Petaluma Gardens property which Elton was also to remove under the terms of the sale, the balance in the checking account at Wells Fargo was $2,899.90. Rosasco's total commission from the sale of the Petaluma Gardens property amounted to $15,000, of which he received $3,850 at the close of the escrow relating to the sale. The balance of $11,150 was payable to Rosasco in installments as C.B. & D. made additional payments on its promissory note of $273,750, described hereinabove. The method by which Rosasco was to be paid the remaining $11,150 was set forth in a blanket authorization dated January 7, 1965, directing Redwood Title, as trustee of the C.B. & D. deed of trust, to release parcels of the Petaluma Gardens property from such deed of trust as payments were made on the installment note. The authorization was given in respect of that provision of the "Additions Agreement" (which became a part of the "Deposit Receipt") and the C.B. & D. deed of trust requiring installment payments on the note prior to specific *76 releases of parcels of the property from the deed of trust itself. Under the authorization, Redwood Title was to remit 4.2 percent of each payment on the note to Rosasco until the $11,150 had been paid, and to thereupon pay the balance of each such payment on the note to Mitchell and petitioners, individually. Although the authorization, which was on a printed form supplied by Redwood Title, stated that it was received from Elton, it was signed by 1087 Mitchell and petitioners, who were the payees of C.B. & D.'s $273,750 note and the beneficiaries of the C.B. & D. deed of trust, as individuals and not on behalf of the corporation. Pursuant to an agreement with C.B. & D., which wanted the Buck house removed from the property, Rosasco attempted to find a purchaser for the house. As a consequence of his efforts in this respect, on June 9, 1965, Elton entered into a deposit receipt agreement with Leroy C. and Jeanette Carstensen (the "Carstensens"), for the sale of the Buck house. Under such deposit receipt agreement, Elton was required to move the house to a specified location off the Petaluma Gardens property to be purchased by the Carstensens, construct a foundation for it, set *77 the house on the foundation, and generally to restore it to its original condition including rebuilding the fireplace which would have to be dismantled. The deposit receipt agreement further specified a purchase price for the house of $18,500, or $4,500 less than the $23,000 which Elton paid to Buck for the house and lot. On June 18, 1965, after the execution of the deposit receipt agreement between Elton and the Carstensens, on the advice of his legal counsel, Garfield submitted to Elton a written proposal on behalf of C.B. & D. to clarify the terms pursuant to which the costs of removing the Buck house from the Petaluma Gardens property would be allotted. C.B. & D.'s proposal provided that it and Elton share such costs equally as well as the $4,500 gross loss incurred by Elton on the sale of the house to the Carstensens. In addition, the agreement provided that Elton acknowledge that it had already received on account from C.B. & D. $2,500, representing the amount in the Buck road account which both Garfield and Mitchell considered to be payable to C.B. & D. under the "Additions Agreement" and "Deposit Receipt." Thereafter, on July 6, 1965, Elton executed a grant deed of the *78 Buck lot to C.B. & D. without consideration, thereby completing the transfer of the Petaluma Gardens property. The next day, Elton and C.B. & D. again acknowledged the liability of each for one-half of the loss involved in removing the Buck house from the Petaluma Gardens property, when they filed instructions with Redwood Title to record the grant deed of the Buck lot. And on July 8, 1965, the Buck road account was closed, and the $2,676.75 (inclusive of interest) therein was used by Elton for its own purposes as a credit against its obligation on the Buck note to Redwood Empire which the corporation had assumed when it repurchased the Buck house and lot, as described hereinabove. As a consequence of this credit, on July 8, 1965, the outstanding balance on the Buck note was $14,591.68. However, sometime prior to that date and without Mitchell's knowledge the Buck house had already been severed from its foundation and was resting on timbers. As such it became personalty and was no longer real estate. As noted hereinabove, such note was secured by a deed of trust, also assumed by Elton. In the circumstances, and also since the Buck lot had already been conveyed to C.B. & D., it became *79 necessary for Elton to pay off the balance on the Buck note and deed of trust. Inasmuch as the corporation did not have sufficient cash, on July 9, 1965, Mitchell and his wife, Bonnie, negotiated a personal loan in their own names from Wells Fargo in the amount of $15,000, which they applied on July 12, 1965, to discharging Elton's indebtedness to Redwood Empire on the Buck note and deed of trust to the extent of the full remaining balance on that date of $14,525.11. On October 9, 1965, 12 months after the meeting of October 10, 1964, at which Mitchell and petitioners agreed to sell the Petaluma Gardens property and to liquidate the corporation, Elton's assets consisted of $146.17 in its Wells Fargo checking account and a receivable from the Carstensens in the amount of $18,500, representing the purchase price of the Buck house. In addition, the corporation's assets included an unascertained liability on the part of C.B. & D. for one-half of the loss and expenses related to the resale and removal of the Buck house. As disclosed hereinabove, Mitchell and petitioners were the individual payees on C.B. & D.'s $273,750 note as well as the beneficiaries of the C.B. & D. deed of trust, *80 and not the corporation. Elton's liabilities as of October 9, 1965, consisted of an indebtedness in the amount of $14,525.11 to Mitchell and his wife, Bonnie, representing the balance of the Buck note which they had personally discharged, and the remaining balance due to Rosasco in respect of his commission on the sale of the Petaluma Gardens property to C.B. & D. in the approximate amount of $11,150. The corporation's liabilities also included the unascertained costs related to the removal of the Buck house. On October 9, 1965, Elton's assets were not sufficient to meet its liabilities. 1088 It eventually became necessary for Mitchell and his wife to reduce the balance on the $15,000 personal loan they had obtained from Wells Fargo to discharge the Buck note. Consequently, certain of the other petitioners (but not Harry C. and Velma N. Allen) contributed the following amounts which were credited against the loan on January 16, 1966: Jessie B. Mitchell
$ 5,000
Donovan J. McCune
5,000
Dorothy M. Dicken 2,500
Total
$12,500 As a result of these contributions, the net amount of Mitchell and his wife Bonnie's personal advance in respect of discharging the *81 Buck note amounted to $2,025.11 (the $14,525.11 balance on the Buck note less the total contributions of other petitioners in the amount of $12,500). Meanwhile, Mitchell, as Elton's general contractor, had undertaken to complete the removal of the Buck house and its installation on the Carstensens' lot. In this respect Mitchell made advances from his personal funds on behalf of Elton in respect of the costs of the removal and installation in the amount of $8,996.71. He submitted a statement of such advances on behalf of the corporation to Rosasco, and a somewhat different and less complete but substantially similar statement to Jessie B. Mitchell, Elton's secretary. In the statement to Rosasco, Mitchell appended the following explanation: For your information Elton Corporation was formed to simplify ownership transactions (there were eight owners in "tenancy in common" on original purchase of the land). The Corporation while a legal entity ceased actual operations with the sale of the land [Petaluma Gardens property] to C.B. & D. After many delays, part of which were due to the difficulty in securing the approval of a building code inspector who demanded that additional work *82 be done on the installation of the Buck house, the installation was completed, and on March 14, 1966, Elton executed a bill of sale conveying the Buck house to the Carstensens. The $18,500 purchase price paid by the Carstensens was deposited to Elton's Wells Fargo checking account two days later on March 16, 1966. The Carstensens subsequently made an additional payment of $500 to the corporation on August 17, 1966, in settlement of a dispute which arose in connection with the installation of the house. Elton applied the $18,500 received from the Carstensens for the Buck house to discharge its obligation to Mitchell and several of the petitioners for the advances made by them, directly and indirectly, in paying off the Buck note, as described hereinabove (supra, pp. ,). Petitioners Jessie B. Mitchell, Donovan J. McCune and Dorothy M. Dicken were reimbursed in the respective amounts of their advances, and Mitchell was paid $5,700 in respect of his and Bonnie Mitchell's net advance in the amount of $2,025.11 and apparently also as partial repayment for advances he had made on behalf of the corporation. In accordance with the provisions of the "Additions Agreement" and the C.B. & D. *83 deed of trust, releases of parcels of the Petaluma Gardens property from the deed of trust occurred as C.B. & D. remitted payments on its $273,750 promissory note. On October 26, 1966, Mitchell and petitioners, as the beneficiaries under the C.B. & D. deed of trust, executed a "Modification Agreement" amending certain aspects of the release provisions of the deed of trust, but otherwise maintaining the requirement that releases would be made only upon payments on the $273,750 note. In respect of the releases, it was the practice of Redwood Title, as trustee, to sometimes obtain a special authorization for a specific release although, as described hereinabove, Mitchell and petitioners had executed a blanket authorization on January 7, 1965. In this manner Mitchell and petitioners were able to have some control over the type of the property released in a particular instance from the C.B. & D. deed of trust, and thereby insure that land of sufficient value remained under deed of trust to secure the balance on the $273,750 note payable to them. On occasion a firm of engineers would check and approve a description of the land to be released. Specific authorizations of this kind for releases *84 were executed by Mitchell and petitioners in their individual capacities on September 14, 1966, and March 29, 1967, and by petitioners alone on April 4, 1969, after Mitchells' death. Redwood Title usually addressed its correspondence in respect of such releases to Mitchell individually (or after his death to petitioner Donovan J. McCune) and not to Elton; and Mitchell similarly in most instances approved particular land descriptions or corresponded with Redwood Title either in his individual 1089 capacity or on behalf of himself and the other beneficiaries of the C.B. & D. deed of trust, and not as president of the corporation. Such was also true of his correspondence with C.B. & D. in connection with various releases. However, in March, 1966, Redwood Title addressed two letters relating to a release of 10.4 acres of land to "Elton Corporation, c/o J.R. Mitchell", and Mitchell himself approved the land description of the 10.4 acres by the inscription "Elton Corporation, by J. R. Mitchell, President". On one occasion Mitchell also approved a request made by C.B. & D. on January 6, 1967, to extend the payment date of an installment on the $273,750 note by signing his name under the *85 caption "Accepted For Elton Corp." Such extension also covered the payment of C.B. & D.'s final share of the costs related to the Buck house. A subsequent modification of the extension, however, wich also included an authorization of release of 3.04 acres of the property from the deed of trust, was executed by Mitchell and petitioners in their individual capacities on March 29, 1967. Although the removal of the Buck house had been completed and the $18,500 purchase price paid by the Carstensens by March 16, 1966, as described hereinabove, it had not been until the end of 1966 that C.B. & D. acknowledged its liability for a precise amount of the costs arising out of the removal of the house from the Petaluma Gardens property and its installation on the Carstensens' lot. In this respect, on December 28, 1966, C.B. & D. had executed a promissory note in the amount of $3,981.01 in favor of Mitchell and the petitioners individually "as their interests may appear". At the same time C.B. & D. also executed a "Notice Of Advance Under Deed Of Trust" the effect of which was to bring the $3,981.01 note under the C.B. & D. deed of trust held by Mitchell and petitioners. As noted hereinabove, *86 Mitchell had personally incurred several expenses on behalf of Elton in connection with the removal and installation of the Buck house in the total amount of $8,996.71. Because the corporation did not have sufficient funds to reimburse Mitchell in full, pursuant to the authorization dated March 29, 1967, referred to hereinabove, Mitchell and petitioners directed Redwood Title to deposit the $3,981.01 to Elton's account in order to afford the corporation sufficient cash to satisfy its obligation to Mitchell in this respect. Accordingly, on April 19, 1967, C.B. & D. remitted the $3,981.01 to Elton, which deposited that amount into its Wells Fargo checking account the next day and thereupon issued a check for $3,700 to Mitchell as reimbursement for expenses incurred by him on the corporation's behalf. Thereafter, the only disbursement made from the Wells Fargo checking account was on August 7, 1967, closing the account by an issuance of a check in the amount of $578.97 to Mitchell. Aside from particular amounts relating to other specified expenses incurred by Mitchell on the corporation's behalf, from the time it reacquired the Buck house and lot on November 12, 1964, until the closing *87 of the Wells Fargo checking account on August 7, 1967, Elton made disbursements from its checkin account to or for the use of Mitchell in the total amount of $11,837.72. Such disbursements were made specifically in respect of expenses paid by Mitchell relating to the removal and installation of the Buck house, as well as for undesignated reasons and in one instance ($158.75 for California franchise tax) for a purpose to which Mitchell in fact did not apply the funds. Of the $11,837.72 total amount, $2,025.11, however, was to reimburse Mitchell and his wife, Bonnie, for the net advance made by them personally in discharging the Buck note (see supra, p. - ). Because of Elton and Mitchell's failure to maintain adequate books and records the record herein contains no explanation of the difference between such net reimbursements ($9,812.61) and the expenses relating to the Buck house incurred by Mitchell ($8,996.71). But the record does indicate that Mitchell also incurred other expenses on behalf of the corporation for which no specific reimbursements were otherwise made. After the sale of the Petaluma Gardens property in January, 1965, Mitchell continued in his business as a general *88 contractor and in 1965 constructed a two-story apartment building for his wife, Bonnie. Elton never filed either state or Federal income tax returns, except for a 1963 Federal corporate tax return dated October 17, 1967, which was filed by Mitchell when advised by an internal revenue agent that returns should have been filed for the corporation. The 1963 return disclosed no income. The corporation did, however, pay the $100 minimum California franchise tax for the calendar years 1962 to 1965, and dues to the Petaluma Chamber of Commerce 1090 on July 27, 1965. On December 31, 1966, Elton issued a $158.75 check to Mitchell for "Payment State Franchise Tax", which would have constituted the amount of the minimum tax, penalties and interest due for 1966, but, as disclosed above, this sum was never remitted to the State of California and no franchise tax was paid by the corporation for that or any later year. The records of the State of California contain no indication that Elton complied with the provisions of the California Corporations Code in respect of the winding up and dissolution of the corporation. Nor did the corporation at any time file a Form 966 required by section 6043, I.R.C. *89 1954, in connection with the planned liquidation of the corporation. Elton's powers, however, were suspended by the Secretary of State of California on January 2, 1968, for failure to pay franchise taxes. Such a suspension is subject to revivor and restoration of the suspended powers upon application and payment of delinquent taxes. As mentioned hereinabove, Mitchell and the petitioners never secured legal counsel, including tax advice, on behalf of Elton in respect of the transaction here in issue, and they themselves were not generally knowledgeable of the legal requirements associated with the conduct of corporate affairs. In respect of the sale of the Petaluma Gardens property, Mitchell did not cause Elton to file a tax return for 1965, but rather advised each of the petitioners to report the proceeds of the sale of the property on their own tax returns as capital gain using the installment basis. Accordingly, on their respective 1965 tax returns, petitioners each treated the sale of the Petaluma Gardens property to C.B. & D. as if the property had been sold by them individually and not by Elton. Moreover, in each case, they computed their proportionat amount of the gain from *90 the sale on the basis that the property had never been conveyed to Elton but was held by them continuously since 1955, the year in which they had initially acquired it as individuals, and proceeded to report such gain by the installment method. In his notices of deficiency in respect of petitioners' individual tax liability, the Commissioner determined that the property was in fact sold by Elton, and that the total amounts reported by petitioners as having been received from the sale of the property were distributions to them by the corporation, of which in each case part was taxable as a dividend and part as gain in excess of a return on capital. The Commissioner also determined in separate notices of deficiency to petitioners that Elton realized gain from the sale of the Petaluma Gardens property and that such gain constituted ordinary income. He further determined that petitioners, as transferees of the assets of Elton, were liable for the amount of tax and penalty of the corporation to the extent of the property received by them. Opinion RAUM, Judge: The principal issue for decision is whether the Elton Corporation complied with the provisions of Section 337, I.R.C. *91 1954, [3] and as a consequence did not recognize any gain from the sale of the Petaluma Gardens property to C.B. & D. Petitioners contend that Elton fulfilled the nonrecognition requirements of section 337: specifically, that Elton adopted 1091 a plan, albeit informal in nature, for the complete liquidation of the corporation, and proceeded within a 12-month period to sell the property in issue and to distribute all of its assets less those retained to meet claims. [4] The Commissioner, on the other hand, attacks the application of the section on several grounds: that no plan was ever in fact adopted by Elton, that the Petaluma Gardens property, in any event, was not asld during the required 12-month period, and also that the assets of the corporation were not distributed in complete liquidation within 12 months of the adoption of the purported plan. [5]
*92 The questions presented herein in respect of the application of section 337 are factual in nature. See Bird Management, Inc. 48 T.C. 586, 592-593; Alameda Realty Corporation, 42 T.C. 273, 281; Mountain Water Co. of La Crescenta, 35 T.C. 418, 425-426; section 1.337-2, Income Tax Regs. Cf. William C. Kind, 54 T.C. 600, 605. Because of the relatively unsophisticated manner in which Elton conducted its affairs, and Mitchell and petitioners' apparent lack of knowledge in all instances as to the precise legal terminology in which certain transactions should have been cast, the record in this case contains evidence in support of both the position taken by the petitioners and that of the Government. We have, however, carefully reviewed the record as a whole and concluded that Elton satisfied the requirements of section 337 and accordingly that the gain arising from the sale of the Petaluma Gardens property is not taxable to the corporation. The first requirement of the statute which is at issue between the parties is whether Elton adopted a "plan of complete liquidation" as required by section 337(a) (1), I.R.C. *93 1954. In this respect it is to be noted that the statute does not require a formal plan or resolution of liquidation on the part of the directors and shareholders of a corporation. Mountain Water Co. of La Crescenta, supra, 35 T.C. at 426-427. See Alameda Realty Corporation, supra, 42 T.C. at 281-282. Cf. Genecov v. United States, 412 F. 2d 556, 561-562 (C.A. 5); Shull v. Commissioner, 291 F. 2d 680, 682-685 (C.A. 4), reversing 34 T.C. 533; Kennemer v. Commissioner9 96 F. 2d 177, 178 (C.A. 5), affirming 35 B.T.A. 415; William C. Kind, supra, 54 T.C. at 605. Rather, if "all the facts and circumstances indicate that the assets were in fact sold as a part of a plan to liquidate the company and the corporation in fact goes out of business and distributes its assets in complete liquidation within the 12-month period", the purpose of the statute is accomplished. Mountain Water Co. of La Crescenta, supra, 35 T.C. at 426. See Alameda Realty Corporation, supra, 42 T.C. at 281. *94 While the plan of liquidation adopted by Elton was informal in nature, the record nonetheless suggests that at the October 10, 1964, meeting of Elton's shareholders and directors, petitioners (save Dorothy M. Dicken who was absent) approved the scheme Mitchell proposed for liquidating the corporation and distributing its assets. Mitchell was the moving force of all of Elton's operations, and petitioners, who 1092 were variously Elton's other directors and shareholders, relied on his management of the corporation and his judgment in conducting its affairs. For various considerations, including the difficulties he had experienced in negotiating with the City of Petaluma, his own precarious health, and his opinion that the development project required too large an investment to be undertaken by petitioners, Mitchell had decided that the Petaluma Gardens property should be sold as one parcel and that Elton should be liquidated. When he secured the C.B. & D. offer, he presented it to petitioners at the meeting on October 10, 1964, and recommended that it be accepted by the corporation subject to further negotiations in respect of the removal of the Buck house from the property and *95 the financial responsibility therefor. He further suggested that Elton be liquidated incident to the sale of the property and outlined proposals for effecting the liquidation, including a provision whereby C.B. & D.'s note and deed of trust in respect of the remaining balance on the purchase price of the Petaluma Gardens property would be made payable individually to the stockholders of the corporation and not to Elton itself. Petitioners thereupon approved and agreed to both the sale of the property and liquidation of the corporation. Subsequent to the October 10, 1964, meeting Elton then proceeded in January, 1965, to sell the Petaluma Gardens property, its only operating asset, and distribute the cash it received out of escrow together with certain other assets to Mitchell and petitioners. Moreover, as part of the plan to liquidate the corporation, the $273,750 note from C.B. & D. was made payable individually to Elton's shareholders and not to the corporation, and they were also named the beneficiaries in their individual capacities of the C.B. & D. deed of trust. Cf. Bird Management, Inc., supra, 48 T.C. at 592-593. Thereafter, Elton's only activities related *96 to discharging its obligations in respect of removing the Buck house from the Petaluma Gardens property, which was an inextricable element of winding up its affairs. See Malcolm C. Howell, 40 T.C. 940, 945-946. Cf. Jeanese, Inc. v. United States, 341 F. 2d 502, 506-507 (C.A. 9), reversing 227 F. Supp. 304 (N.D. Cal.). To be sure, there were no corporate minutes or resolutions formally manifesting the intention of Mitchell and petitioners to liquidate Elton. And the corporation filed neither a final tax return nor an information Form 966 as required by section 6043, I.R.C. 1954. But it is to be noted in this respect that the corporation never consistently observed the formalities of sophisticated corporate conduct. Except for Mitchell and his wife, Bonnie, none of the parties interested in Elton had any experience in real estate transactions, and none of Elton's stockholders or directors were knowledgeable of all the technical legal requirements associated with corporate existence or, for that matter, corporate demise The close inter-relationship of Mitchell and all the petitioners, moreover, allowed Mitchell to conduct *97 Elton's affairs through an informal consensus of opinion rather than by virtue of formally vested corporate authority in every instance. In similar circumstances, it was held in Alameda Realty Corporation, supra, 42T.C. at 282, that the absence of a formal resolution and minutes, or other formalities often associated with corporate liquidations, is not destructive of an intended plan and commitment to liquidate where it is otherwise clear that a corporation has adopted such a design aimed at its liquidation. And while there are certain differences between Alameda Realty and the case before us, we think the two cases are substantially similar as to require the same result in this respect. Indeed, Elton's plan of liquidation evolved simultaneously with its decision to sell the Petaluma Gardens property and thereby dispose of its one operating asset, at which point its purpose for existence would cease. Cf. Mountain Water Co. of La Crescenta, supra, 35 T.C. at 426-427. That the sale of the property took place within the 12-month period prescribed by the statute - *98 and not prior to the adoption of the plan of liquidation as contended by the Commissioner - cannot be doubted. The offer incorporated in the "Deposit Receipt" as it was executed by Garfield on October 5, 1964, was not accepted at that time by Mitchell on behalf of the corporation. Rather, Mitchell indicated that he could not agree to all the terms for the sale and purchase of the property proposed by Garfield, and that he would retain the "Deposit Receipt", in any event, for petitioners' signatures. Thereafter, Mitchell and Garfield continued to negotiate in respect of the terms of the proposed agreement, and especially in connection with the financial responsibility for the removal of the Buck house. Mitchell and petitioners 1093 did not sign the "Deposit Receipt" until the October 10, 1964, meeting, at which time they agreed also to liquidate the corporation. As executed by them and deposited into escrow thereafter on October 12, 1964, the "Deposit Receipt", according to a stipulation of the parties, constituted a contract of sale of the Petaluma Gardens property. But the contract was contingent on an engineering study satisfactory to C.B. & D. to be made within 90 days. Under *99 the Commissioner's own regulations, such a contingent and conditional contract would not be sufficient to effect a "sale" of property within the meaning of the statute, which could ordinarily only occur when title to the property actually passed. Section 1.337-2(a), Income Tax Regs. In the circumstances of this case, it is therefore clear that the Petaluma Gardens property was conveyed to C.B. & D. in January, 1965, - within and not before the 12-month period, when the escrow of the property was closed, the appropriate documents executed and recorded, and title to the property passed to C.B. & D. [6]
*100 We furthermore think that the record supports the petitioners' contention that Elton also distributed all of its assets, less those retained to meet claims, within the 12-month period specified in the statute. To be sure, Elton continued in existence until January 2, 1968, when its corporate powers were suspended by the Secretary of State of California for nonpayment of franchise taxes, a circumstance in itself not inconsistent with the complete liquidation of the corporation within the necessary time. Cf. Alameda Realty Corporation, supra, 42 T.C. at 282. And during this period the corporation did engage in certain activities through Mitchell in respect of the removal of the Buck house from the Petaluma Gardens property. However, in this respect it is to be noted that the Petaluma Gardens property was Elton's only operating asset. Except for its ownership of that property for the purposes of development, the corporation had no other assets apart from a minimal balance in its checking account and the funds in the Buck road account, which were not available for its general use. Elton's continued existence and its activities in respect of the Buck house must be considered *101 in the light of the other circumstances present here: that the corporation otherwise distributed all of its assets within the required 12-month period, and that the activities in relation to the removal of the Buck house from the property merely constituted the carrying out of an obligation in the nature of a claim against Elton. Cf. Richard W. Pastene, 52 T.C. 647, 655-656; Alameda Realty Corporation, supra, 42 T.C. at 282. In this respect the record indicates that upon the sale of the Petaluma Gardens property and the distribution of the proceeds therefrom together with cash from its checking account, the corporation - stripped of its only operating asset - effectively concluded its business operations. Cf. Richard W. Pastene, supra, 52 T.C. at 655-656. And when the $273,750 note from C.B. & D. was made payable to Mitchell and petitioners individually, and they and not Elton were named the beneficiaries of the C.B. & D. deed of trust, the corporation effectively caused a distribution of the other assets stemming from the sale and liquidation of the Petaluma Gardens property. Bird Management, supra, 48 T.C. at 592-593. [7] *102 Admittedly, the corporation was not dissolved in the legal sense. But dissolution is not a 1094 requisite of the statute here in issue. It is enough that the corporation undergo "complete liquidation" and that its assets, less those retained to meet claims, are distributed to its shareholders within the prescribed 12 months. Mountain Water Co. of La Crescenta, supra, 35 T.C. at 427. Cf. section 1.337-2(b), Income Tax Regs.
*103 At the termination of the 12-month period, Elton's assets were insufficient to meet its claims. Such assets consisted of the $18,500 receivable from the Carstensens, in respect of the resale of the Buck house, and $146.17 in the corporation's checking account. There also existed an "asset" representing the unascertained liability on the part of C.B. & D. for its share of the loss and expenses related to the resale and removal of the Buck house. The corporation's assets were, however, offset by liabilities consisting of the corporation's $14,525.11 indebtedness to Mitchell and his wife, [8] approximately $11,150 payable to Rosasco, and Elton's share of the unascertained costs of removing the Buck house and installing it on the Carstensens' lot. See Jeanese, Inc. v. United States, supra, 341 F. 2d at 506-507 (C.A. 9), reversing 227 F. Supp. 304 (N.D. Cal.).
*104 Moreover, the corporation's activities in respect of the Buck house were an intrinsic part of its liquidation, and represented the discharge of an obligation, in the nature of a claim, on Elton's part. Pursuant to the "Deposit Receipt" and the "Additions Agreement" Elton conveyed to C.B. & D. the entire Petaluma Gardens property without exclusion of the parcel previously sold to Buck, and undertook to repurchase the Buck house and lot, sharing the financial responsibility therefor with C.B. & D. The inclusion of the Buck lot in the sale was required by C.B. & D.'s insistence on purchasing the entire property. It was therefore incumbent on Elton to assume the obligation of repurchasing the Buck house and lot and of presiding over the removal of the house in order to effect the sale and liquidation of its principal and only operating asset. As our findings show, the Buck house and lot were in fact reacquired, and the lot was in fact conveyed to C.B. & D. on July 6, 1965. There remained only the obligation to remove the house from the lot. Where there is a "marked contraction of corporate activity *105 and a substantial reduction in corporate assets", as there was here, such "related [transactions]" (even with the expectation of profit, although there was none in this case) are not inconsistent with a plan of complete liquidation. Malcolm C. Howell, supra, 40 T.C. at 945-946. Nor does such activity on Elton's part, at least where there was no expectation of gain, but merely a necessary commitment to facilitating the overall sale of its one operating asset, suggest that its assets were not completely distributed in liquidation To the contrary, the payments made to its stockholders after the 12-month terminal date, and especially to Mitchell, were all related to the corporation's disposal of the Buck house, and were either repayment of loans, made to or on behalf of the corporation in discharging its obligation on the Buck note, or reimbursements to Mitchell for the costs of relocating the house itself. There were no distributions of corporate assets to stockholders after the close of the 12-month period. The Buck house or Carstensens receivable, far from simply signifying an asset retained by Elton in excess of claims beyond the 12-month terminal date, cntailed also *106 a corresponding claim and obligation to which Elton was subject in order to carry out its plan of liquidation. [9] See Jeanese, Inc. v. United States, supra, 341 F. 2d at 506-507 (C.A. 9), reversing 227 F. Supp. 304 (N.D. Cal.). It was a necessary and incidental link in winding up the affairs of the corporation from which there was no expectation of profit. This is not, therefore, a situation where it can be readily said that Elton retained "assets" beyond the prescribed period in excess of its obligations or continued to engage in activities unrelated to its continuing purpose to 1095 terminate its affairs. See Mountain Water Co. of La Crescenta, supra, 35 T.C. at 427-428. Cf. Malcolm C. Howell, supra, 40 T.C. at 945; T.T. Word Supply Co., 41 B.T.A. 965, 980-981. In concluding as *107 we do that Elton complied with the provisions of section 337, we are nonetheless aware that the record is not devoid of evidence lending support to the Commissioner's position. In March, 1966, for instance, Mitchell approved a land description in respect of a release from the C.B. & D. deed of trust in his capacity as Elton's president. And he also accepted, on behalf of the corporation, a request made by C.B. & D. on January 6, 1967, to extend the payment date of an installment on the $273,750 note. But, troubling as this evidence may be, it is to be considered in light of Mitchell's general lack of awareness, in all circumstances, of corporate formalities and legal technicalities. In fact, in most instances Mitchell and petitioners executed the documents in respect of releases from the C.B. & D. deed of trust in their individual capacities. Indeed, a modification to the extension sought by C.B. & D. was thereafter signed by Mitchell and petitioners individually and not on behalf of Elton, on March 29, 1967. [10] After giving due weight to the conflicting evidence it is our best judgment that the scales tip in favor of petitioners. *108 It follows from our conclusion that Elton qualified for the nonrecognition treatment afforded by section 337, that the distributions made to petitioners fall within the provision of section 331(a), I.R.C. 1954, and are taxable to them as full payment in exchange for their Elton stock. Alameda Realty Corporation, supra, 42 T.C. at 282. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: John R. Mitchell, deceased, by his surviving spouse and representative, Bonnie Mitchell, and Bonnie Mitchell, docket Nos. 2599-69, 4382-69; Harry C. Allen and Velma N. Allen, docket Nos. 2600-69, 4381-69; Dorothy M. Dicken, docket Nos. 4351-69, 1551-70; Donovan J. McCune, docket Nos. 4352-69, 1550-70; and Jessie B. Mitchell, docket No. 4353-69.↩
2. The reference to "petitioners" denotes the parties who were the actual purchasers of the land in issue. Bonnie Mitchell is a petitioner herein both as the representative of John R. Mitchell, deceased, her late husband, and in her own individual capacity. John R. Mitchell, however, was not a party to the purchase of the property in question, and the reference to "petitioners" herein does not include him unless otherwise specified or indicated by the context in which the term is employed.↩
3. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule. - If - (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. (b) Property Defined. - (1) In general. - For purposes of subsection (a), the term "property" does not include - (A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business, * * * (2) Nonrecognition with respect to inventory in certain cases. - Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term "property" includes - (A) such property so sold or exchanged, and (B) installment obligations acquired in respect of such sale or exchange. (c) Limitations. - (1) Collapsible corporations and liquidations to which section 333 applies. - This section shall not apply to any sale or exchange - (A) made by a collapsible corporation (as defined in section 341(b)↩), * * *. 4. The petitioners no longer take the position - relied on in part in their petitions and reflected on their 1965 tax returns - that Elton was merely a corporate shell to be disregarded for the purposes of determining the tax consequences of the sale of the Petaluma Gardens property and that, in substance, such sale was In this respect petitioners concede that they improperly reported the corporation's gain from the sale of the property on their own tax returns using the installment method. Rather, petitioners' primary argument herein is that the sale of the property was part of a plan to liquidate Elton which falls within the nonrecognition provisions of section 337, I.R.C. 1954. As such, they suggest that their own individual tax liability is to be determined under section 331(a), I.R.C. 1954↩, relating to distributions made in complete liquidation of a corporation, and that there is no underlying liability for tax on Elton's part in respect of which petitioners are liable as transferees of the corporation. 5. In addition, the Government has presented for the first time on brief the general argument that Elton is not permitted nonrecognition under section 337 by virture of section 337(c) (1) (A) which denies application of the section to "collapsible corporations", as defined in section 341, I.R.C. 1954. See Leisure Time Enterprises, Inc., 56 T.C. 1180. Since the Commissioner chose not to raise the issue of Elton's "collapsibility" in his statutory notice of deficiency, in his pleadings in this case or at the trial herein, the question is not timely raised on brief, and accordingly we shall not consider it. Merle P. Brooks, 36 T.C. 1128, 1133; Warner G. Baird, 42 B.T.A. 970, 975-976. Whether a corporation is "collapsible" is an issue that could well affect the presentation of evidence at the trial, and in the circumstances this is not a proper case for application of the rule that a deficiency may be approved on grounds other than those relied upon by the Commissioner. See Wilkes- Carriage Co., 39 T.C. 839, 845, affirmed per curiam 332 F. 2d 421↩ (C.A. 2).
6. We note that inasmuch as Elton held the Petaluma Gardens property solely for development and resale the property constituted "stock in trade" of the corporation within the meaning of section 337(b)(1)(A), I.R.C. 1954, and as such the sale thereof would normally be excluded from the nonrecognition treatment afforded by section 337. Richard W. Pastene, 52 T.C. 647, 656-658. However, section 337(b)(2) provides a so-called "bulk sale" exception to this exclusion where "substantially all" (emphasis added) of the proscribed "stock in trade" is sold "to one person in one transaction", as was the case here when Elton conveyed the entire Petaluma Gardens property, inclusive of the Buck lot, to C.B. & D. in January, 1965. See Jeanese, Inc. v. United States, 341 F. 2d 502, 506-507 (C.A. 9), reversing 227 F. Supp. 304 (N.D. Cal.); Luff Co., 44 T.C. 532, 538-539↩.
7. The fact that Mitchell and petitioners were the payees of the note and the beneficiaries of the C.B. & D. deed of trust makes this case quite different from Maxine Development Co. Inc., 22 T.C.M. 1579↩, relied on by the Commissioner. In that case the corporation continued its existence for the purpose of collecting mortgage payments and dealing with the ultimate foreclosure of the defaulting purchaser, thereby evincing an intent not to terminate its business but to maintain its corporate existence in the event it should become necessary to reacquire the property sold purportedly in liquidation. Here the rights of foreclosure fell upon Elton's shareholders when they became the beneficiaries of the C.B. & D. deed of trust securing the $273,750 note of which they were also the payees. The case before us is similarly unlike Vern Realty, Inc., 58 T.C. , where the corporation retained substantially all of its assets beyond the 12-month period and made no effort to effect a transfer of the assets to its stockholders.
8. Part of this indebtedness was later assumed by certain other, but not all, of the petitioners when they contributed a total of $12,500 to reduce the balance on John R. and Bonnie Mitchell's personal loan from Wells Fargo which had been obtained by them to personally discharge the Buck note for which Elton had become obligated. The Commissioner has attempted to make much of the repayment of these obligations and in doing so has characterized them as "distributions" to the corporation's stockholders beyond the 12-month terminal date specified in section 337↩. But we think the record is clear that these amounts signify the repayment of a loan necessitated by the corporation's efforts to wind up its affairs, and not distributions.
9. Indeed all the assets retained by Elton beyond the 12-month terminal date related solely to disposition of the Buck house, and as such were essentially set aside for that purpose inasmuch as the assets were inherently part of that obligation on Elton's part. Cf. section 1.337-1, Income Tax Regs.↩
10. We similarly regard without merit the Government's contention that the two letters written on behalf of Elton to the planning commission and mayor and city council of the City of Petaluma manifest an intention on the part of Mitchell and petitioners to keep the corporation alive in case C.B. & D. defaulted on its $273,750 note and it was necessary to foreclose on the deed of trust. There is substantial evidence on the record indicating that the sole intention of the parties interested in Elton was to conclude its theretofore limited activities. Moreover, Mitchell and petitioners, not the corporation, were the payees of the $273,750 note and the beneficiaries of the C.B. & D. deed of trust. In this respect it is noteworthy that the two letters, upon which the Government relies, stated that in the event of default "the sole remedy of our client [Elton] or the existing beneficiaries [Mitchell and petitioners] would be to foreclose and take back title to such property" (emphasis supplied), suggesting at most that such correspondence was written on behalf of Elton as well as its individual shareholders who became the real parties in interest when the $273,750 note from C.B. & D. was made payable to them and they were named the beneficiaries of the deed of trust securing it.↩